Loyd Carroll GRANDSINGER, Petitioner,

v.

Joseph B. BOVEY, Warden, Nebraska State Penitentiary, Respondent.

Civ. No. 0265.

United States District Court D. Nebraska. June 27, 1957.

Eugene D. O'Sullivan, Sr., Omaha, Neb., and Charles H. Flansburg, Lincoln, Neb., for petitioner.

Clarence S. Beck, Atty. Gen., and Ralph D. Nelson, Asst. Atty. Gen., of Nebraska, for respondent.

DELEHANT, District Judge. (Retired, serving by assignment)

Loyd Carroll Grandsinger, who will usually be referred to herein as "petitioner", is confined in Nebraska State Penitentiary, of which Joseph B. Bovey is the duly appointed warden, prelim-

inary to the proposed and contemplated execution of a sentence of death by electrocution, imposed upon petitioner by a judgment of the District Court of Cherry County, Nebraska, after the return of a verdict finding him to be guilty of a charge of murder in the first degree. Joseph B. Bovey will generally be designated as "respondent".

By leave of court, and after the presentation of an affidavit of poverty, petitioner filed, in forma pauperis, in this court and cause his application for writ of habeas corpus, along with a motion for appointment of counsel, and a motion for a stay of the execution of the sentence theretofore pronounced against him. The court, thereupon, entered orders, a) staying until the final determination of this proceeding the execution of the judgment and sentence of death, b) appointing the attorneys above identified as his counsel for the purposes of this proceeding[1], and c) ordering the respondent to show cause, within a period of time then fixed, why a writ of habeas corpus should not be issued, and granting to the petitioner leave to serve and file a response to such showing of cause. Respondent having served and filed a return to such order to show cause, and petitioner having served and filed a showing counter thereto, the court, upon due consideration of the record thus made, issued a writ of habeas corpus, to which respondent made timely return, in which he reiterated through incorporation by reference the allegations of his showing of cause. With the approval of counsel as to time, hearing was had upon the issues thus

made; and, upon separate motions of the parties, further and supplemental hearing was had still later. Briefs and oral arguments of counsel have been submitted and considered, and the case is ready for final ruling by this court.

Two broad questions are encountered upon the submission. One is whether the jurisdiction of this court is properly invoked. And its answer depends upon petitioner's exhaustion of such remedies as are available to him under the law and in the courts of Nebraska. The other is whether, if jurisdiction be affirmed, petitioner has made out in his pleadings and by his proofs a case entitling him to the relief for which he prays. That question has to be determined with due regard to the several grounds of invalidity by him urged against his conviction and sentence and the evidence relevant to those grounds.

It seems appropriate that the issues and the pertinent facts and the court's final ruling should be set out separately and distinctly, first upon the jurisdictional issue, secondly upon the merits of petitioner's claim. That sequence is observed in this announcement. Primarily, therefore, the factual or historical setting in which the issue of the exhaustion of state remedies arises will be recalled. It will not, however, be the purpose of the court to repeat in detail findings pertinent to that issue which are also significant upon the main problem of the petitioner's claim of invalidity in his conviction and sentence.

The "judgment and sentence" was made and given in and by the District Court of Cherry County, Nebraska, on June 16, 1954 after the return earlier on

---

1. The petitioner had expressly requested the appointment of Mr. O'Sullivan as an attorney in his behalf and, without the expression of a personal preference, of another attorney to assist him. Ordinarily, this court declines to appoint as counsel for persons requesting appointment of attorneys any member of the bar for whose appointment request has been directly made. Without discussion, it may sufficiently be said that the honoring of such nominations is calculated to expose both the court and counsel to ob-

vious embarrassments. But in this instance, as the records disclosed and the court was aware, Mr. O'Sullivan had already rendered substantial professional service for petitioner through the procurement of persons interested in petitioner's plight. His appointment, therefore, appeared to be peculiarly appropriate. And Mr. Flansburg was selected by the court upon its own motion to participate in this proceeding in association with Mr. O'Sullivan.

that date of a verdict of a jury finding the petitioner to be guilty of murder in the first degree as charged in the information on which he had been tried and fixing the penalty at death[2], and after the filing and overruling, also on the day of the return of the verdict, of a motion for a new trial. The petitioner, thereafter, made timely filing of a petition in error and perfected an appeal from the judgment and sentence to the Supreme Court of Nebraska. That court affirmed the judgment and sentence of the trial court on December 16, 1955. See Grandsinger v. State, 161 Neb. 419, 73 N.W.2d 632. It is obvious, from an examination of the opinion just cited, that it did not strictly examine or rule judicially upon either phase of the presently asserted grounds of invalidity of petitioner's conviction and sentence, vide infra. Until the announcement of that ruling by the state's Supreme Court and for some time thereafter, vide infra, the alleged grounds of such invalidity had not been clearly and explicitly presented to and urged upon that court. The petition in error upon which the ruling just identified was made had been filed by petitioner on July 15, 1954. Like the motion for new trial already adverted to, it assigned as a specification of error in the trial "error in the admission of evidence for the state". That specification in the motion for new trial is in the exact language of the quotation just made. It is set out thus in the petition in error: "The trial court erred in admitting on behalf of the state incompetent, irrelevant and immaterial and prej-

udicial evidence over the objection of the petitioner." In his brief as petitioner in error in the Supreme Court of Nebraska, petitioner included within his statement of facts some assertions that question the freedom and voluntariness of statements, written and oral, on his part touching the offense charged against him which had been received in evidence. But he did not in such brief poise a real appellate contention or argument upon that point. In relation to that manner of submission of the appeal, it is fairly obvious that, despite certain language in its opinion,[3] referring to his admissions received in evidence upon the murder trial, the state Supreme Court appears not to have considered the issue of freedom and voluntariness to have been tendered with a measure of clarity and directness adequate to require close examination by the reviewing court. And no reference to the subject appears among the syllabi or headnotes of the opinion in the official report.[4]

On January 5, 1956 petitioner filed a motion for rehearing in the state's Supreme Court of which a copy is included with a supporting brief in a filing made in that court apparently on January 14, 1956 concurrently with the argument upon the motion. The motion for rehearing was overruled without opinion by an order entered and dated on February 11, 1956. In that motion for rehearing no effort was made to raise or tender to the court either of the grounds relied upon by the petitioner in this proceeding.[5]

2. In the state courts of Nebraska the determination of the sentence, as between death and life imprisonment, rests with the jury upon its finding and return of a verdict of guilty of murder in the first degree. Section 28–401, R.S.Neb.1943, Reissue of 1956.

3. Cited and quoted in detail in the later portion of this memorandum which deals with the merits of petitioner's assertion of facts on which he relies to support the invalidity of his conviction.

4. At this point, however, it should be noted that in its editorial treatment of

the same opinion (see 73 N.W.2d 632) West Publishing Company, with supporting reference to the paragraph of the opinion later underlined herein, has included as its first numbered headnote the declaration that: "In murder prosecution, whether defendant's confessions were voluntarily given and whether he made several statements contained therein were matters for determination by jury under appropriate instructions."

5. The statement prompting this note is made understandingly. Although the motion for rehearing asserts error in permitting the testimony of James F. Shoe-

A mandate of affirmance and a death warrant having meanwhile been made and given by the Supreme Court of Nebraska, petitioner, on March 8, 1956 filed in that court and in the proceeding pending therein for review of his conviction a motion for recall of the mandate and stay of execution of the judgment and an application for stay pending an effort by petitioner to obtain a writ of certiorari from the Supreme Court of the United States for the review by the latter court of the affirmance by Nebraska's Supreme Court of the conviction of and sentence upon petitioner. In that motion two of the questions which petitioner specified for raising by petition for writ of certiorari are thus set out:

"(f) Was plaintiff in error compelled to give evidence against himself in violation of the constitutional privilege against self incrimination, or, was plaintiff in error denied his constitutional right to a fair and impartial trial, or, was plaintiff in error denied due process of law, by the admission by the District Court of Cherry County, Nebraska, of evidence of purported confessions and statements of plaintiff in error which the record showed were extracted from the plaintiff in error by means of threats, physical and mental duress, physical and mental exhaustion, and physical and mental torture?

\* \* \* \* \* \*

"(i) Was plaintiff in error denied his constitutional right to adequate representation by counsel through actions of his counsel prejudicial to his case?"

The motion in this paragraph identified was signed by petitioner in his own name, and not in his behalf by Mr. Charles A. Fisher, his then surviving attorney.[6] There is nothing in the motion to indicate that Mr. Fisher had any part in its preparation. Actually, an affidavit in the record declares that he had none and knew nothing of the motion's contents until after its filing. But for want of a proper submission of that issue, and because it is not dispositively significant, no finding is now expressly made upon it.

On March 17, 1956 the Nebraska Supreme Court entered orders recalling its mandate and staying further proceedings until May 18, 1956.

Under date of April 27, 1956, but with filing as of April 30, 1956, petitioner filed in the Supreme Court of Nebraska written notice that he had dismissed Mr. Fisher as his attorney on March 13, 1956, and on April 25, 1956 had retained Mr. O'Sullivan as his attorney; and on April 28, 1956, Mr. O'Sullivan signed an entry of appearance in petitioner's behalf, which was also filed on April 30, 1956.

Thereafter, and on June 18, 1956, through Mr. O'Sullivan as his attorney, petitioner filed in the Supreme Court of Nebraska a motion for leave of court to file an amended and supplemental motion for rehearing and a brief for rehearing, along with a copy of the proposed amended motion and brief. On that day also, the Supreme Court of Nebraska entered an order granting the motion and setting the amended and supplemental motion for rehearing for hearing before that court on June 23, 1956. Raised and tendered

---

maker to go to the jury, the testimony to which it refers is clearly limited by the motion and its supporting brief to "evidence of other crimes than that with which the accused is charged." And that is true despite the fact that the testimony thus challenged was oriented to a conversation in which Shoemaker participated, out of which emerged a statement constituting one of the so-called "confessions" of the petitioner. The motion for rehear-

ing does not go to the length of challenging the admission of the "confession" itself, but narrowly attacks only an incidental feature of Shoemaker's evidence by way of support of the "confession".

6. For a recital of the history of petitioner's representation by counsel, see the factual findings, infra, incident to the merits of this proceeding. It is regarded as more directly significant there than in this preliminary jurisdictional inquiry.

in and by the amended and supplemental motion for rehearing and brief were the following grounds for relief, as reflected in the motion itself:

"3. Due to the confessed criminal misconduct of Charles A. Fisher, his then chief counsel, plaintiff in error was denied effective representation of counsel which was and is in violation of his rights under Section 1 of the Fourteenth Amendment to the Constitution of the United States, relating to deprivation 'of life, liberty, * * * without due process of law * * *.'

"4. The plaintiff in error was denied due process of law as guaranteed to him by said Section 1 of the Fourteenth Amendment of the Constitution of the United States in that the misconduct of defense counsel, the misconduct of the special prosecutor in forcing defense counsel to confess to a possible criminal act before the jury, the failure of the trial court to protect the rights of the plaintiff in error, and the permeating incompetence of defense counsel, each and all of which denied plaintiff a fair trial as contemplated by the Constitution of the United States as heretofore referred to.

"5. The alleged confessions of the plaintiff in error were obtained in violation of the due process of law clause aforementioned and their admission in evidence was and is in violation of the said due process clause of the Fourteenth Amendment of the United States Constitution aforementioned."

And the motion also tendered the following questions:

"2. Did the confessed criminal and wrongful misconduct of defense counsel in tampering with the evidence and rendering it valueless create a conflict of interest between defense counsel and his client which denied plaintiff in error effective and unqualified representation by counsel?

"3. Did the claimed incompetence, fraud and misconduct of defense counsel, in a trial where the evidence was close, where defense counsel's misconduct was exploited by the special prosecutor to plaintiff in error's substantial prejudice, and where the trial court failed to protect the fundamental rights of the plaintiff in error, create an exceptional situation which deprived the plaintiff in error of a fair trial under the Fourteenth Amendment of the United States Constitution as heretofore claimed?

"4. Were the confessions, which were admitted in evidence by the trial court, obtained under such circumstances that their use by the State was contrary to the rights guaranteed to plaintiff in error by the Fourteenth Amendment of the United States Constitution heretofore referred to?"

Hearing was had on the amended and supplemental motion for rehearing on June 23, 1956, and it was denied without opinion by an order of the Supreme Court of Nebraska made and entered on June 30, 1956.

Stay of execution of the sentence having theretofore been granted by one of the justices of the Supreme Court of the United States, petitioner, on July 9, 1956 filed in that court a petition for a writ of certiorari to review the foregoing action of the Supreme Court of Nebraska, in which petition were presented the following questions:

"1. Was petitioner, a defendant in a state capital case, denied due process under the Fourteenth Amendment to the United States Constitution:

(a) Where defense counsel was caught during the trial tampering with the evidence introduced in the case by the State, was forced to confess his criminal misconduct in open court before the jury, thereby debasing and disgracing himself and his much harried client, and thus placing himself in a situation in

which his own interests in protecting his professional future were adverse to the duties he owed his client, and where this conflict of interest prevented him from giving petitioner effective and unqualified representation by counsel; and/or

(b) Where the exploitation of defense counsel's misconduct by the prosecutor and trial court, coupled with defense counsel's general incompetence, particularly in failing to make proper and adequate objections in preserving federal questions for review, and other misconduct of the prosecutor and the failure of the trial court to protect petitioner's essential rights, deprived petitioner of a fair trial.

"2. Did the admission and use of petitioner's confessions constitute a denial of due process under the Fourteenth Amendment to the United States Constitution."

On October 22, 1956, the Supreme Court of the United States entered an order denying the foregoing petition for a writ of certiorari. Grandsinger v. Nebraska, 352 U.S. 880, 77 S.Ct. 104, 1 L.Ed.2d 81.

On October 29, 1956, the Supreme Court of Nebraska by an order fixed December 28, 1956 between the hours of 6:00 a. m. and 6:00 p. m. as the time for the execution of the sentence upon the petitioner and issued a death warrant accordingly.

Shortly before the time thus prescribed for the execution of the sentence petitioner in his own name filed herein the application for a writ of habeas corpus. While he acted in that behalf in his own name, it should not be supposed that his application is to be regarded as the work of an illiterate litigant. He manifestly had the assistance of a person or of persons skilled in the law in its preparation. That will not, indeed can not, be denied. The grounds for relief set out in the application are these:

"The above described judgment and sentence was and is null and void because during the trial a conflict of interest arose which destroyed petitioner's trial counsel's ability effectively to represent petitioner. Due to this conflict of interest petitioner was deprived of the effective and unqualified representation of counsel which the Fourteenth Amendment to the United States Constitution commands to be afforded to a defendant in a state capital case."

The deprivation of the right of counsel arose for the following reasons:

"(a) Petitioner alleges that during the course of his trial for first degree murder in the District Court of Cherry County, Nebraska, the State of Nebraska introduced into evidence a belt allegedly worn by the victim; that said belt allegedly contained a hole which the State of Nebraska contended was made by the fatal bullet; that the State of Nebraska sought by expert testimony to prove that the hole could have been made only by a .22 caliber size bullet; that such evidence was important to the State's case; and that the Court impressed the importance of the Exhibit upon the jury and warned them merely to examine but not to probe at the hole.

"(b) Petitioner further alleges that on the tenth day of the trial, when the proceedings had reached the crucial stage at which final arguments of counsel were to be made to the jury, petitioner's Chief Defense Counsel was caught in the act of attempting to enlarge the size of the hole in the said belt by pushing a tapered dowel stick through it, said misconduct occuring (sic) after the exhibits had been brought into the courtroom but before court had actually convened.

"(c) Petitioner further alleges that his counsel caused or permitted counsel's gross misconduct to be brought to the jury's attention, as shown by the following proceedings

which took place when the court convened a few moments later:

"By Mr. Clarke (special prosecutor):

"Before we proceed with the arguments, Your Honor, there is a matter that has been taken up with, Your Honor, which we wish to get into the record.

"The Court: Very well.

"Mr. Clarke: We wish the record to show that counsel for the defendant, is willing that it shall show, that this morning (sic) in this court room, after the court reporter had brought all the exhibits in the case out and laid them on the reporter's desk, Mr. Fisher, one of the counsel for the defendant, while he was examining Exhibit No. 10, being the leather pants belt heretofore identified as the belt of Marvin Hansen, and that at that time he took a dowel, being one of the wooden dowels on the reporter's desk, and being either the same or one exactly like the one I am holding in my hand, which I will have to have marked as an exhibit, and pushed it violently—

"Mr. Fisher: (Interrupting) I didn't violently push it—

"Mr. Clarke: (Interrupting) pushed it through the hole in the belt hard enough so that it materially enlarged the size of the hole to an extent which cannot now be determined and that the belt, Exhibit No. 10, is not now in the same condition as it was when it was offered in evidence and received in evidence, and that the hole is now materially larger than it was before Mr. Fisher did that.

"(Mark this dowel as an exhibit, please.)

(The wooden dowel referred to was marked as Exhibit No. 75.)

"The Court: Mr. Fisher, as I understand it you have told counsel that you did that?

"Mr. Fisher: Yes.

"The Court: You recognize that the hole is larger?

"Mr. Fisher: Yes.

"(d) Petitioner further alleges that his counsel's confessed willingness to have this conduct brought to the jury's attention was a flagrant violation of the duties counsel owed to petitioner; that petitioner's defense was and is that he is innocent, and that at the time this misconduct took place the jury was going to have to resolve conflicting evidence and, in the event of a guilty verdict, determine whether or not to impose the death penalty; that defense counsel must have known how prejudicial it would be to petitioner's rights to have the jury diverted from the grave and difficult duties it faced to the gross misconduct of counsel; but that defense counsel nonetheless made no effort to protect petitioner's rights.

"(e) Petitioner further alleges that his counsel was diverted from his duty to use all honorable means to present facts and arguments in behalf of petitioner and to abide by the Canons of Professional Ethics of the Legal Profession because of a conflict of interest created when his misconduct was discovered and he therefore faced the prospect of criminal punishment, disbarment or other disciplinary action, or economic loss; and that counsel resolved this conflict of interest by cooperating with court and prosecutor in order to protect himself, in utter disregard of his duties to petitioner, whose own life was then in jeopardy.

"(f) Petitioner further alleges that the foregoing acts of misconduct were done without petitioner's knowledge at any time and without his consent or authorization, express or implied.

"The above described judgment and sentence was and is void for the reason that purported confessions of petitioner were received in evi-

dence and used to influence the jury notwithstanding the fact that the purported confessions were coerced and their use violated petitioner's rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

"These purported confessions were coerced and their admission in evidence was a violation of petitioner's constitutional rights for the following reasons:

"(1) Prior to the time petitioner was apprehended he was physically, emotionally and mentally exhausted, having gone without food for twenty-four hours and without sleep for a similar or longer period. Petitioner had nearly drowned and was in no condition to undergo a long and intensive period of questioning.

"(2) Petitioner was threatened, intimidated, and physically abused by officers of the state, Cherry County, and other members of the posse which captured him on Friday afternoon, April 9, 1954.

"(3) Petitioner was immediately taken to Valentine, Nebraska, for questioning and was frightened by a large mob milling about the place of questioning.

"(4) On Friday evening, April 9, 1954, petitioner signed a purported confession after having been threatened, physically abused, and interrogated at great length by police officers.

"(5) Petitioner at later times made other purported confessions which were used at the trial as a basis for the judgment and sentence of death now imposed upon petitioner. Petitioner alleges that these confessions were false, and were the result of further physical disabuse, threats, intimidations, and long and intensive questioning lasting for many hours, which made petitioner confess out of fear for his life.

"(6) Petitioner alleges that he was held incommunicado from the time of his arrest on Friday afternoon, April 9, 1954, until at least Wednesday, April 14, 1954, and that despite attempts by friends, relatives and others to contact petitioner, he, petitioner, was not permitted to secure legal counsel or to consult with and obtain the advise (sic) of friends and relatives.

"(7) Petitioner further alleges that he was not promptly given a preliminary hearing as required by the law of the State of Nebraska."

In the countershowing here of petitioner replying to respondent's return to the order to show cause why the writ should not be issued, petitioner's court appointed counsel amplified and particularized the grounds for relief asserted by him in his application to this court. That was done in language which, though not copied at length, is summarized by the writer hereof in a footnote [7].

7. Without any attempt at verbal exactness, the following is a summary, paragraph by paragraph, of the material set out by petitioner in the countershowing to which reference has been made in the body of the memorandum.

1. Petitioner was apprehended by members of a posse during the afternoon of April 9, 1954. He was not afforded an early preliminary hearing as required by law. He was retained in custody and confined in jail many days before the filing of the complaint and before any preliminary hearing; during which period he was physically abused, threatened and placed in fear by officials of the county and state and held in jail without permission to confer or make contact with counsel, relatives or friends, and in that interval subjected to grueling interrogation and efforts by officials to extort a confession from him.

2. At the times of the filing of the complaint against petitioner and of his preliminary hearing, he was taken from jail to the county court without explanation of the proceedings to be had in that court and without assistance of counsel; and at the preliminary hearing the charges against him were read in unintelligible technical language, and, at the suggestion of the county attorney, petitioner pleaded not guilty thereto. De-

Petitioner's status as "a person in custody pursuant to the judgment of a state court" would seem sufficiently to have been emphasized. In view of it, Title 28 U.S.C. § 2254 has to be regarded. It follows:

"An application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner.

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

Essentially, that section, newly enacted in 1948, translated into formal legislation and somewhat clarified and amplified a procedural requirement that had emerged from many reported judicial opinions, of which Ex parte Hawk, 321 U.S. 114,

spite any record of the proceedings indicative to the contrary, petitioner did not know of, or knowingly waive, any right to preliminary hearing.

3. During petitioner's trial and at a point therein immediately prior to oral argument, Mr. Fisher, chief defense counsel, committed the acts of misconduct charged against him in petitioner's application for a writ herein, vide aliter, and after the ensuing argument the case was submitted to the jury which returned its verdict of guilty and fixing the death penalty, early on the following morning. Later on the day of the return of verdict, Mr. Fisher prepared written motion for a new trial, caused it to be filed with the clerk of the court, and such motion was overruled, also on the day of return of verdict; whereupon and immediately, the trial court pronounced sentence and fixed date of execution. Such motion for a new trial did not assign, as one of its grounds, the misconduct of Mr. Fisher and the petitioner's resultant deprivation of the effective assistance of counsel, and did not assign, as one of its grounds, the denial of due process in the trial resulting from the admission in evidence of the so-called confessions, notwithstanding their alleged infirmities. Actually, the motion for new trial was prepared and filed hastily as a result of prearrangement between counsel for petitioner and the special prosecutor for the state to serve the convenience of counsel residing at a distance from the place of trial and save Cherry County and the State of Nebraska certain expenses, but in disregard of petitioner's rights and interests. The conduct of Mr. Fisher thus reflected deprived petitioner of a fair and impartial consideration of any proper motion for a new trial, and the protection of his constitutional rights and establishes a conflict of interest between petitioner and his counsel which was by his counsel resolved in counsel's favor.

4. The petition in error prepared by Mr. Fisher did not raise the constitutional questions of deprivation of counsel resulting from counsel's misconduct, and the denial of due process arising out of the use of the admissions or confessions, or either of such issues. Due to the death of William C. Heelan, one of petitioner's attorneys, shortly after the Cherry County trial and before the appeal was presented to the Supreme Court of Nebraska, petitioner, in consequence of Mr. Fisher's conduct, was, therefore, actually deprived of all assistance of counsel.

5. Because of Mr. Fisher's failure to raise such constitutional questions, the decision of the Supreme Court of Nebraska did not discuss or dispose of such questions. Nor were they raised by Mr. Fisher in the original motion for rehearing filed in the State's Supreme Court or disposed of by that court in its ruling on the motion.

6. Petitioner's motion for recall of mandate, vide supra, was not prepared by Mr. Fisher.

7. The motion for leave to file amended and supplemental motion for rehearing and brief thereon, filed on June 12, 1956 by Mr. O'Sullivan, raised for the first time the constitutional questions and issues presented in the application to this court for writ of habeas corpus.

8. The constitutional questions raised in the petition for writ in this cause were fully presented to the Supreme Court of the United States in petitioner's petition for writ of certiorari, and that petition was denied by the Supreme Court of the United States.

64 S.Ct. 448, 88 L.Ed. 572, is a fair reflection and summary.

By virtue of the cited statute, it appears that a petitioner for a writ to procure his release from confinement under a state judgment is absolved from the necessity of resort to state remedies if "it appears * * * that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights" of the petitioner. The question at once arises, therefore, whether either of those supposed inadequacies of state procedure appears. Its answer is not unmistakably clear when one examines the course of Nebraska authority. The per curiam opinion in Ex parte Hawk, supra, though with something less than adequate assurance and analysis, indicates that until its date, the Supreme Court of the United States thought that, in Nebraska's procedural system, one might seek relief against a void sentence by a state court through a writ of habeas corpus or by quest of a writ of error coram nobis, depending upon the appropriateness of those remedies severally to the history of his particular case. But subsequent phases of Hawk's efforts to secure his release from imprisonment [8] served somewhat to obscure the certainty of Ex parte Hawk, supra. Later in 1944, in Hawk v. Olson, 145 Neb. 306, 16 N.W.2d 181, 183, the Supreme Court of Nebraska affirmed a judgment of the District Court of Lancaster County, Nebraska, summarily denying a petition of Hawk for a writ of habeas corpus. In the course of its opinion it undertook to distinguish between the availability of the writ of error coram nobis and that of habeas corpus; and, doing so, used this language:

"The writ of error coram nobis has been recognized in this state. Carlsen v. State, supra" (i. e. *129 Neb. 84, 261 N.W. 339*). "The object of the writ is to bring into the record, before the court that rendered the judgment, facts which were unknown to the defendant at the time of trial through no lack of reasonable diligence on his part, which, if known at the time of the trial, would have resulted in a different judgment. As stated in Carlsen v. State, supra * * *: '* * * the writ of habeas corpus does not afford a corrective judicial process to remedy an error of fact, at the trial, without which a conviction would not have resulted. * * * Habeas corpus is not a proper remedy to release one from prison who has been wrongfully convicted.'"

Reviewing that ruling upon certiorari the Supreme Court of the United States in Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 120, 90 L.Ed. 61, reversed it and remanded the case for the purpose of trial upon the merits of Hawk's claim that he had been denied the effective assistance of counsel. In its opinion, the court, speaking through Mr. Justice Reed, said, among other things:

"As the Supreme Court of Nebraska considered the motion for continuance on the merits, no question of state procedure for the re-examination of criminal convictions arises. As to the issue on the motion for continuance, our duty requires us to determine only whether or not the denial under the facts alleged violates due process. We think there was an allegation that no effective assistance of counsel was furnished in the critical time between the plea of not guilty and the calling of the jury. Continuance may or may not have been useful to the accused but the importance of the assistance of counsel in a serious criminal charge after arraignment is too large to permit speculation on its effect. We hold that denial of

---

8. Which persisted until death eventually overtook Hawk and found him in the enjoyment of a precarious, and perhaps temporary, discharge from custody.

Hawk v. Hann, D.C.Neb., 103 F.Supp. 138; Hann v. Hawk, 8 Cir., 205 F.2d 839 and 207 F.2d 82.

opportunity to consult with counsel on any material step after indictment or similar charge and arraignment violates the Fourteenth Amendment.

"Petitioner states a good cause of action when he alleges facts which support his contention that through denial of asserted constitutional rights he has not had the kind of trial in a state court which the due process clause of the Fourteenth Amendment requires. This, of course, does not mean that uncontradicted evidence of a witness must be accepted as true on the hearing. Credibility is for the trier of the facts. The evidence may show that the charge was served upon petitioner well in advance of the trial (see note 5, supra) and that he had ample opportunity to consult with counsel and secure any needed witnesses. He may have intelligently waived his constitutional rights. Adams v. U. S. ex rel. McCann, 317 U.S. 269, 275, 63 S.Ct. 236, 240, 87 L.Ed. 268.

"Petitioner carries the burden in a collateral attack on a judgment. He must prove his allegations but he is entitled to an opportunity."

But when the case was returned to the Nebraska Supreme Court with a mandate of reversal, that court refused to enter judgment on the mandate of the Supreme Court of the United States, Hawk v. Olson, 146 Neb. 875, 22 N.W.2d 136, 138. In its justification of that patently unusual course it said in part:

"We think the Supreme Court of the United States overlooked the full import of our opinion, for it said: 'When the corrective process is provided by the state but error, in relation to the federal question of constitutional violation, creeps into the record, we have the responsibility to review the state proceedings.' (Emphasis supplied.) 'As the Supreme Court of Nebraska considered the motion for continuance on the merits, no question of state procedure for the reexamination of criminal convictions arises.' (Emphasis supplied.) The Supreme Court of the United States thus, as a premise for its jurisdiction to review and for its decision, assumed a proposition of state law contrary to our holding in the case.

\*    \*    \*    \*    \*

"A 'question of state procedure for the reexamination of criminal convictions' did arise and was determined by us. That question remains in this case and is here now. A habeas corpus proceeding is not a 'corrective judicial process' in which the questions which petitioner seeks to present may be determined in the courts of this state. Although it holds that habeas corpus is a process available in the federal courts to redress the violation of the federal constitutional right, the Supreme Court of the United States does not discuss nor pass upon the nature of the remedy available in the courts of Nebraska.

"It is not for us to say what constitutes a violation of the due process of law clauses of the Federal Constitution when the Supreme Court of the United States has spoken on that subject with relation to the question presented. Neither is it for us to say what issues may be justiciable in an application for a writ of habeas corpus when that writ is sought in the federal courts. But those are not and were not the issues presented and determined by us.

"The issue here now is the same as it was when the case was initially before us, and that is, what issues are justiciable in an application for a writ of habeas corpus in the courts of this state. That question is for the courts of this state to decide. We have the undoubted right to decide upon our own jurisdiction and the jurisdiction of the courts of this state to which our appellate power extends. Davis v. Packard, 8 Pet. 312, 8 L.Ed. 957; Johnson v.

Radio Station WOW [146 Neb. 429] 19 N.W.2d 853. The Supreme Court of the United States has said: '* * * the state may supply such corrective process as to it seems proper.' Frank v. Mangum, 237 U.S. 309, 335, 35 S.Ct. 582, 590, 59 L.Ed. 969, 983:

"In Jackson v. Olson [No. 32012, 146 Neb. 885] 22 N.W.2d 124 [165 A.L.R. 932], released concurrently herewith we have re-examined and restated the rules governing the use of the writ of habeas corpus in this state and pointed out that our holdings are in accord with the decisions of the Supreme Court of the United States there cited. Those rules are: To release a person from a sentence of imprisonment by habeas corpus, it must appear that the sentence was absolutely void. Habeas corpus will not lie to discharge a person from a sentence of penal servitude where the court imposing the sentence had jurisdiction of the offense, had jurisdiction of the person of the defendant, and the sentence was within the power of the court to impose. Such a judgment is not void. Habeas corpus cannot be used as a substitute for a writ of error. Habeas corpus is a collateral and not a direct proceeding when regarded as a means of attack upon a judgment sentencing a defendant. The regularity of the proceedings leading up to a sentence in a criminal case cannot be inquired into on an application for a writ of habeas corpus, that matter being assailable only in a direct proceeding. When the judgment is regular upon its face and was given in an action where the court had jurisdiction of the offense and of the person of the defendant, extrinsic evidence is not admissible to show its invalidity.

"Under those rules the issue,

which the Supreme Court of the United States said petitioner presents, cannot be determined in a habeas corpus proceeding in the courts of this state.

\* \* \* \* \*

"In full accord with our decisions we are required to hold that petitioner's issues which the Supreme Court of the United States said he is entitled to have an opportunity to prove are issues which are not justiciable in a habeas corpus proceeding in this state."

See also Jackson v. Olson, 146 Neb. 885, 22 N.W.2d 124, referred to in the companion Hawk opinion; and Swanson v. Jones, 151 Neb. 767, 39 N.W.2d 557, both essentially supporting the view advanced in the Hawk opinion from which quotation has just been offered.

Hawk, thereafter, undertook to procure his release through quest of a writ of error coram nobis but without success. Hawk v. State of Nebraska, 151 Neb. 717, 39 N.W.2d 561, 565, certiorari denied 339 U.S. 923, 70 S.Ct. 612, 94 L. Ed. 1346. It is to be noted, however, that on that occasion, he obtained, in the trial court, a hearing upon the merits of his claim, and, in the state's Supreme Court, a review of the decision below upon the merits. He failed not because the remedy pursued was wholly unavailable but because, as both of the state courts found, the operative facts did not support his claim, including the element of it having to do with the alleged denial of the effective assistance of counsel. In the state Supreme Court's opinion emphasis was placed upon Hawk's knowledge, or readily available opportunity with reasonable diligence to have knowledge, at the time of his initial trial, of the wrongs of which he was complaining in the proceeding for writ of error coram nobis. And it also expanded upon Hawk's supposed competence to represent himself in criminal litigation.[9] The

9. In that position the writer of the opinion was quite unrealistic. Actually, Hawk was an ignorant old man and the victim of an unreasoning obstinacy that was rooted in and nourished by his very ignorance. The observation now made is based upon a close familiarity with the man himself and with the pleadings in

following excerpt from the opinion cited in this paragraph is instructive upon the state court's appraisal of the reach of its writ of error coram nobis:

"The writ of error is brought for a supposed error in law apparent on the record, and takes the case to a higher tribunal where the question is to be decided and the judgment, sentence, or decree is to be affirmed, modified, or reversed, while the writ of error coram nobis is brought for an alleged error in fact not appearing on the record, and lies to the same court in order that it may correct the error, which it is presumed would not have been committed had the fact in the first instance been brought to its notice. See 3 Am. Jur., Appeal and Error, § 1276, p. 766.

"The common-law writ of error coram nobis is not a substitute for the statutory remedy of a writ of error under the Nebraska criminal procedure. See, Carlsen v. State, 129 Neb. 84, 261 N.W. 339, certiorari denied 293 U.S. 607, 55 S.Ct. 123, 79 L.Ed. 698; Newcomb v. State, 129 Neb. 69, 261 N.W. 348; Swanson v. State, 148 Neb. 155, 26 N.W.2d 595, certiorari denied, 331 U.S. 863, 67 S.Ct. 1759, 91 L.Ed. 1869.

"The purpose of the writ of error coram nobis should be noted. The writ of error coram nobis is to enable the court to recall some adjudication, made while some fact existed which, if before the court, would have prevented rendition of the judgment, and which, through no fault of the party, was not presented. See Swanson v. State, supra.

"The common-law writ of error coram nobis to bring into the record facts which were unknown to the defendant at the time of trial through no lack of reasonable diligence on his part, which, if known at the time of the trial, would have resulted in a different judgment, exists in this state under section 49–101, Comp.St.1929, now section 49–101, R.S.1943. See Carlsen v. State, supra.

"Where the facts alleged are known to the applicant before or during the progress of the trial, or could have been known by the exercise of reasonable diligence, the writ must be denied. See, Swanson v. State, supra; Dobbs v. State, 63 Kan. 321, 65 P. 658; 24 C.J.S. Criminal Law § 1606(6), p. 154."

Long examination of Nebraska's decisions within this area of the law, including, but not at all limited to, those already cited applications and limitations of the law, does not persuade this court that in the state's jurisprudence there is an absence of available state corrective process for the vindication of a position such as petitioner is now taking. It is true that the later Hawk opinions tend strongly to support the view that a proceeding in the state court for a writ of habeas corpus may not be resorted to in Nebraska's courts because of error or denial of due process in the reception of an involuntary or coerced statement or confession made by one accused of crime, or even because of the denial of the federally guaranteed constitutional right to the effective assistance of counsel through the circumstances pleaded here, vide infra. But it does not appear that the issue of the denial of the effective assistance of counsel may not be raised in a proceeding for a writ of error coram nobis. That is especially true in this case in the light of the manner in which the asserted deprivation of such assistance arose and of the present petitioner's age and immaturity. Those factors seem clearly to distinguish it from Hawk's problem.

Nor is any circumstance known or believed to exist which renders any avail-

most of the very cases upon which reliance seems to be placed in support of the thesis of his competency. They un-

mistakably betrayed their author's incompetency.

able process ineffective to protect the rights of the petitioner if properly asserted in the state courts. Upon that point, this court is satisfied that, under all of the conditions that existed in petitioner's trial he would not, in a state court corrective proceeding, find himself barred from the full and fair consideration of his contention of the denial of the effective assistance of counsel by reason of his failure, in the crisis in which he unwittingly found himself at the most perilous moment of his trial for a capital offense, to repudiate his erring counsel and thereafter to assume his own defense.

The court, therefore, is persuaded that it must inquire whether there has been an exhaustion by petitioner of the remedies available to him under the laws and in the courts of Nebraska. That inquiry has been made and it is believed that it must be answered affirmatively. It has frankly to be acknowledged that the court's conclusion would be directly to the contrary but for Brown v. Allen, 344 U.S. 443, 73 S.Ct. 397, 402, 97 L.Ed. 469. Prior to the ruling in that case, this court had admittedly thought of the exhaustion of state remedies exclusively in terms of the so-called "collateral remedies". One might have been mistakenly led to that supposition by the language of Ex parte Hawk, supra, although that opinion did not deal at all with the subject of direct proceedings for review of conviction but arose in a setting in which only collateral remedies were involved. But Brown v. Allen, supra, seems conclusively to have settled the question.

That ruling affected three separate appeals from the affirmance of denials of petitions for writs of habeas corpus tendered by state prisoners to United States District Courts after they had pursued no corrective remedy other than an unsuccessful appeal to the state's Supreme Court from their original convictions and sentences and an unavailing application to the Supreme Court of the United States for a writ of certiorari to review the affirmance of such convictions. The procedural posture of each of the cases then before the Supreme Court of the United States was, therefore, identical with that of the present action. And, despite a wide variety of view upon other matters, as reflected in the opinions reported under the single citation, the court seems clearly to hold that, without the prosecution of any collateral proceeding whatsoever, the presentation of the issue relied upon for a writ of habeas corpus, in a direct appeal from conviction, followed by the unsuccessful effort to obtain review through certiorari, sufficiently exhausts state remedies to comply with Title 28 U.S.C. § 2254.

In the body of the opinion by Mr. Justice Reed, it is said that:

"* * * We conclude that all required procedure for state review of the convictions had been exhausted by petitioners in each case before they sought the writs of habeas corpus in the federal courts. In each case petitions for certiorari to this Court for direct review of the state judgments rendered by the highest court of the state in the face of the same federal issues now presented by habeas corpus had been denied.

"It is not necessary in such circumstances for the prisoner to ask the state for collateral relief, based on the same evidence and issues already decided by direct review with another petition for certiorari directed to this Court. It is to be noted that an applicant is barred unless he has 'exhausted the remedies available in the courts of the State * * * by any available procedure.' The legislative history shows that this paragraph, in haec verba, was presented to the Congress with the recommendation of the Judicial Conference. The legislative history of [28 U.S.C.] § 2254 has no discussion of the considerations which moved congressional enactment other than that contained in S. Rep. No. 1559. But see a similar clause § 2254 in H.R. 3214, 80th Cong., 1st Sess.; H.R. 3214, 80th Cong., 2d Sess.; S.Rep. No. 1559,

80th Cong., 2d Sess., p. 9; Report of the Judicial Conference of Senior Circuit Judges, 1947, pp. 17–20.

"The second paragraph of § 2254 has been construed by several courts of appeals. In Ekberg v. McGee, 9 Cir., 191 F.2d 625, the Ninth Circuit refused to consider that the statute meant to deny a federal forum where state procedures were inexhaustible. The Third Circuit in [United States ex rel.] Master v. Baldi, 198 F.2d 113, 116, held that the exhaustion of one of several available alternative state remedies with this Court's denial of certiorari therefrom is all that is necessary. In Bacom v. Sullivan, 5 Cir., 181 F.2d 177, and Bacom v. Sullivan, 5 Cir., 194 F.2d 166, the Fifth Circuit ruled that when a federal question had been presented to the state courts by at least one post-conviction procedure, certiorari on the same question having been once denied by this Court, there appeared a unique and extraordinary circumstance justifying federal examination under Darr v. Burford, 339 U.S. 200, 70 S.Ct. 587, 94 L.Ed. 761.

"When, in April 1948, Judge Maris presented the Judicial Conference draft of § 2254 to the Senate Judiciary Subcommittee, the language of the revision of 28 U.S.C., on which the hearings were being held, set out three bases for exercise of federal jurisdiction over applications for habeas corpus from state prisoners. Under the language of the bill as it then read, an application might have been entertained where it appeared (1) that the applicant had exhausted the remedies available in the courts of the state, or (2) where there was no adequate remedy available in such courts, or (3) where such courts had denied the applicant a fair adjudication of the legality of his detention under the Constitution and laws of the United States. In accepting the recommendation of the Judicial Confer-

ence, the Congress eliminated the third basis of jurisdiction. S.Rep. No. 1559, p. 9, shows the reason for this as follows:

" 'The second purpose is to eliminate, as a ground of Federal jurisdiction to review by habeas corpus judgments of State courts, the proposition that the State court has denied a prisoner a 'fair adjudication of the legality of his detention under the Constitution and laws of the United States.' The Judicial Conference believes that this would be an undesirable ground for Federal jurisdiction in addition to exhaustion of State remedies or lack of adequate remedy in the State courts because it would permit proceedings in the Federal court on this ground before the petitioner had exhausted his State remedies. This ground would, of course, always be open to a petitioner to assert in the Federal court after he had exhausted his State remedies or if he had no adequate State remedy.

" 'The third purpose is to substitute detailed and specific language for the phrase 'no adequate remedy available.' That phrase is not sufficiently specific and precise, and its meaning should, therefore, be spelled out in more detail in the section as is done by the amendment.'

"If the substitution for 'adequate remedy available' of the present definition was intended by the Congress to eliminate the right of a state prisoner to apply for relief by habeas corpus to the lower federal courts, we do not think that the report would have suggested that a remedy for denial of a 'fair adjudication' was in the federal court. The suggested elimination of district and circuit courts does not square with the other statutory habeas corpus provisions. See 28 U.S.C. §§ 2241, 2242, 2251, 2252, 2253, 3d paragraph 28 U.S.C.A. §§ 2241, 2242, 2251, 2252, 2253. We are unwilling to conclude without a

definite congressional direction that so radical a change was intended."

And the initial paragraph of the syllabus is in this language:

"Where, on direct review of his conviction, a state prisoner's claim of federal constitutional right has been decided adversely to him by the state supreme court and an application to this Court for certiorari has been denied, he has satisfied the requirement of 28 U.S.C. § 2254 that state remedies be exhausted before a federal court may grant an application for habeas corpus. Pp. 446–450.

"(a) It is not necessary in such circumstances that he pursue in the state courts a collateral remedy based on the same evidence and issues. Pp. 447–450.

"(b) Section 2254 is not to be construed as requiring repetitious applications to state courts for relief. P. 448, n. 3."

This court now puts aside with brief comment, but only after due study and reflection, the argument that the precise issues now submitted to this court have not been presented in the proceedings in the state court relied upon as exhausting state remedies. That contention appears to be factually unsupported. The history of the appellate proceedings pursued by petitioner has already been set out at great length and this includes extensive disclosure of the issues presented in the various appellate steps. It is true that, prior to the filing of the opinion of the Supreme Court of Nebraska in Grandsinger v. State, 161 Neb. 419, 73 N.W.2d 632, the issue of the denial of the effective assistance of counsel was not tendered at all and the issue of the denial of due process through the admission in evidence of involuntary and coerced statements of petitioner was only inadequately tendered. But promptly thereafter, and with the State Supreme Court's allowance, upon motion therefor, and in the amended and supplemental motion for rehearing, both questions were squarely and vigorously urged upon the court. That court denied corrective relief despite the presentation of those issues. And certiorari was thereafter sought upon the record thus finally made, and it was denied. Admittedly, this court might have proceeded with greater assurance if the State's Supreme Court had accompanied its final ruling with an opinion. But it was not obliged to do so. And it may be supposed now to have considered and rejected the position taken in the amended and supplemental motion for rehearing. If it were going to disregard it as not really submitted for consideration it should have refused leave to file the amended and supplemental motion. And certainly the denial of certiorari occurred in the face of the whole record as finally made.

Accordingly, whatever this court might have concluded before the decision in Brown v. Allen, supra, it now considers and holds that the record before it shows an adequate compliance with Title 28 U.S.C. § 2254. And it proceeds to the examination of petitioner's claims upon their merits.

At the threshold of the consideration of the merits of the proceeding, it is in order, without purposeless repetition of the language of the pleadings already set forth, to recall the grounds which petitioner asserts for his release from his present custody. They are, first, his deprivation of due process of law, through the admission in evidence in his trial upon the first degree murder charge, of certain statements or confessions, in part written and partly oral, claimed by him not to have been voluntarily made but rather to have been extorted from him by force and coercion, both physical and mental; and secondly, the denial to him of the effective assistance of counsel guaranteed by the Sixth Amendment of the Constitution of the United States, through the wrongful conduct of his principal counsel near the close of his trial and the action, thereafter and incident thereto, of such counsel, of the special prosecutor for the state, and of the trial judge. No issue is here made upon the guilt or innocence of petition-

er under the murder charge which evoked his trial in, and was the vital question before, the state court. This court is necessarily unconcerned with, and will express no opinion upon, his guilt. Nor will it find facts or discuss problems relating solely to such guilt and not involved, immediately or remotely, in either or both of the two substantive grounds for relief now relied upon by petitioner.

Loyd Carroll Grandsinger was born August 28, 1932. In April, 1954 he was, therefore, approximately twenty-one years, eight months of age. He was five feet six inches in height and weighed slightly more than one hundred twenty pounds. On the score of his racial background, he has some not clearly defined North American Indian blood but is largely white in his appearance. In the way of formal education he had completed the common or grade school courses and between one year and two years of high school studies. In appearance he is alert and intelligent; and he readily and clearly understands and uses the English language. His mother had died when he was about thirteen years old, but his father is still living. Petitioner was born at Valentine, Nebraska which is near to the interstate boundary between Nebraska and South Dakota, only about twelve miles southerly from it, in fact. His boyhood home had been in the portion of Nebraska and in the neighboring part of South Dakota, largely in the latter state, in which his father lived in April, 1954 and still lives. However, early in April, 1954 and for a few months immediately theretofore, petitioner resided in Bell Gardens, a suburb of Los Angeles, California. He was married and had one child. Early in April, 1954 he was estranged from his wife but not alienated from her beyond hope of reconciliation. He has a brother, Leon Grandsinger, who is about ten or eleven years his senior, and in early April, 1954 was also in the Los Angeles, California vicinity.

Early in April, 1954 and probably during the predawn portion of April 3, 1954, petitioner and Leon Grandsinger left the Los Angeles area intending to proceed to northwestern Nebraska and to neighboring South Dakota communities. They traveled by automobile and started in a single old Ford car belonging to petitioner. Throughout the trip petitioner was armed with a .22 calibre pistol and before reaching Nebraska, Leon Grandsinger acquired and had a pistol of the same calibre. They also had ammunition with which to use those weapons. They proceeded generally through Las Vegas, Nevada, thence along U. S. highway 66 to Provo, Utah, and on through Rock Springs, Wyoming and Hot Springs, South Dakota, and eventually to Springview, Nebraska. Along the way at various places that are not identified they stole, principally from standing automobiles, items of property whose kind and value are not disclosed. At some point in Wyoming they also stole an automobile and, from that point forward, used it for their motive power and to tow petitioner's older vehicle. Though they had arrived in the general vicinity where their father lived they did not go to his home or report to him upon their whereabouts; and he first learned of their probable presence in the area only after the occurrence of the homicide out of which petitioner's sentence later arose, and then through a radio newscast in which it was declared that the Grandsinger boys were being sought in that connection.

During the night of Wednesday, April 7–8, 1954 a small store in which was maintained the United States post-office at Wewela, South Dakota [10] was entered burglariously and from it a considerable quantity of merchandise and a very small amount of money were stolen. Petitioner and his brother, Leon, were suspected of the burglary.[11]

On April 8, 1954, petitioner and Leon Grandsinger visited at some length at

10. That village is located only about two miles northerly from the South Dakota-Nebraska boundary.

11. Actually, in one of the statements, whose receipt in evidence upon his trial he charges as violative of his constitutional rights, petitioner admitted the offense and narrated several of its details.

the home of one Brandenburg, a farmer on the Nebraska side of the state line, for whom petitioner had worked for a short while some months earlier, and also with two brothers named Frederickson with whom the two Grandsinger brothers made arrangements that during that evening, the Fredericksons, by the use of a piloting automobile, would direct or lead the two Grandsingers to a secluded place in the general neighborhood where, unobserved, they might do some work on their automobiles. But the Fredericksons then proceeded to make contact with William C. Freeman, the Sheriff of Cherry County, Nebraska, to lead the Grandsingers into a trap and betray them into the hands of the sheriff.

On that night at about 11:30 o'clock, the Fredericksons in their automobile, with the Grandsingers following, Leon driving the automoble that was stolen in Wyoming and with it towing petitioner's unlighted car which petitioner was guiding, drove southerly on highway 7 at a point in Cherry County, Nebraska several miles east and north of Valentine. Alerted by a prearranged signal, Freeman, the sheriff, and one Marvin Hansen, a member of the Nebraska state highway patrol, in an automobile equipped for police highway pursuit, followed the Grandsingers for a short distance and then, by warning signals, caused them to stop their cars on the west side of the roadway facing south. The officers' vehicle was then stopped easterly from the Grandsinger cars, but so turned and with its lights in such position as to illuminate the Grandsingers and their automobiles. The sheriff then took Leon Grandsinger into custody without any noteworthy incident. But petitioner withdrew from the right side of his towed and then standing automobile and was approached from the rear of the vehicle by patrolman Hansen, and then sought to escape by running to the west. Some shots were fired and, shortly thereafter, Hansen was found lying fatally wounded by a bullet which the State of Nebraska charged, and on petitioner's trial undertook to prove, was fired from a .22 calibre weapon. The state's position was that petitioner was the only person involved who was in possession of such a weapon, the pistol of Leon Grandsinger having been seized by the sheriff early in the encounter, and that the pistols of the sheriff and Hansen were both .38 calibre in size. In any event, petitioner escaped for the time being in the darkness and over the rough terrain westerly from the site of the automobiles and of the shooting of Hansen.

Through the remainder of that night and until about 3:00 o'clock in the afternoon of Friday, April 9, 1954, petitioner remained in hiding in the rugged country in that neighborhood and along the northerly bank of the Niobrara river flowing through it. He insists that in that interval he had no rest, though he concedes that he may have obtained some fitful sleep. It is reasonably certain that such rest as he may have gotten was not unbothered.

Meanwhile, prompted by the homicidal death on duty of one of its members, a large, but not precisely shown, number of the troopers and officers of the State highway patrol assembled in an effort to apprehend the petitioner. And, under the sheriff's direction, a posse was recruited which searched the countryside for the petitioner. The exact number of the posse's members may not be determined or declared with certainty. It appears quite clearly to have approached or reached three hundred. But it was scattered and operating over a wide area in northern Nebraska and southern South Dakota and was, therefore, spread pretty thin. Not many men were effectively gathered at one time in any single space. Most of the members of the posse were armed.

Finally, at about 3:00 o'clock p. m., on April 9, 1954, petitioner observed a number of men arriving in and moving out of automobiles and searching in the area where he was and, in the correct persuasion that he was their quarry, undertook by flight to avoid capture. In the effort he plunged into the Niobrara river, by whose current he was carried down

stream and entirely below the surface of the water, until he reached the safety of a projecting log.

He was then approached by, and induced to surrender to, Brandenburg, his former employer who was generally friendly to him. Immediately before, and when, Brandenburg took him into his custody there was an occasional and audible comment, among the fifteen or twenty members of the posse that were near at hand, suggesting that petitioner should be shot or otherwise killed; and the gun of one bystander was actually discharged but with no injury to anyone. Brandenburg, with little effort managed to prevent any violence towards, or demonstration against, petitioner. And he also delivered petitioner into the custody of the members of the state patrol.

Petitioner was then completely drenched from his encounter with the waters of the river. He was unkempt and his hair was disarranged. The temperature was cold and chilling.[12] His clothing was saturated with water and the lower part of one leg of his trousers was badly torn.

In company with four other men, petitioner was first driven a short distance by automobile to the yard of a school house not far distant from where he was apprehended. There the sheriff entered that vehicle and seated himself in the right side of the front seat of the car which was being operated by a State patrolman. Petitioner sat between those two men. And two other men sat in the rear seat. Thus arranged, the occupants of the automobile were driven to the court house, in which the jail is located, at Valentine, several miles distant. That car was accompanied by several other vehicles in which other patrolmen and members of the posse rode. Before the car left the school house yard for Valentine there had been some comment in petitioner's presence and hearing, suggesting that a crowd of people might already have assembled at Valentine and might be disposed to deal violently with petitioner. And it was partly to intercept any such development that a considerable number of men, including several state patrolmen, in other vehicles accompanied the automobile in which petitioner was removed to Valentine.

On arriving at Valentine the car carrying petitioner was driven into the court house yard. When petitioner neared and reached the court house a not precisely determinable number of people, some of whom were armed, had gathered and were present in the court house grounds, including some children as well as adults. They did not in anywise constitute or resemble a mob and offered no violence to petitioner. Nevertheless he was aware from their very presence that they resented the killing of Marvin Hansen, and, suspecting petitioner of the homicide, were unfriendly to him. However, no attempt or threat was made by them to mistreat him. Promptly on reaching the entrance to the court house, he was taken by the sheriff, accompanied by a state patrolman, and with other patrolmen standing precautionarily by, into the court house and to the District Court quarters on its second floor. He was in handcuffs with attachment to a restraining belt about his body, which had been fastened upon him shortly after his apprehension and, thus fastened, kept in place.

As petitioner was brought into the District Court quarters, a small number of people loitering there were by the sheriff ordered to, and did, withdraw. The sheriff took petitioner into the chambers of the District Judge where several people were present, including Mr. Bryan Quigley, the County Attorney of Cherry County, one Leo Knudsen, a lieutenant of the Nebraska state highway patrol, and his brother Jack Knudsen, for several years theretofore a member of the state patrol who was practiced in the field

12. There is testimony supporting and some disputing this declaration. But it must be remembered that the day was April 9 and the location the extreme northerly part of Nebraska. In that situation a "warm day" is to be understood in a purely relative sense.

of criminal investigation, but had previously withdrawn from that employment and was then operating a drug store at Gordon, a small neighboring city. Jack Knudsen had been requested by the County Attorney to come to Valentine and assist in the investigation of the Hansen homicide. Earlier that day he had interviewed, and taken a statement from, Leon Grandsinger. Petitioner was told quite promptly on his arrival in the Judge's Chambers that he was to be interrogated with a view to the procurement from him of a confession. Thereupon, the County Attorney and the sheriff withdrew and left petitioner, still handcuffed and in restraint in the company of the two Knudsen brothers. Leo Knudsen is a man six feet three inches in height and proportionately large. Jack Knudsen is substantially smaller, a man of ordinary size. Within a few minutes, Mrs. Frances Wells [13] was brought into the room and introduced to the petitioner. She is and then was a member of the Nebraska bar and qualified as a legal stenographer and secretary, who had theretofore been, but in April, 1954 was not, employed as secretary in the County Attorney's office. And she appeared at the time for the purpose of stenographically recording and transcribing any statement which might be taken from petitioner.

A brief preliminary conversation thereupon ensued between the Knudsens and petitioner, at the close of which one of the Knudsens in the presence, and ostensibly in the name, of petitioner dictated to Mrs. Wells two paragraphs in this language:

"I, Loyd Carrol Grandsinger, make the following voluntary signed statement to Lt. L. E. Knudtson and Jack Knudtson, who have identified themselves to me as a Lieutenant of the Nebraska Safety Patrol and Jack Knudtson is a druggist in Gordon, Nebraska. No threats or promises have been made to me to get me to make this statement. I have been advised that I do not have to make a statement and I know anything I say can be used against me in a court of law.

"I am 21 years of age, being born August 28, 1932, at Valentine, Nebraska. I have been residing in Bell Gardens, California, which is a suburb of Los Angeles, since January of 1954. I was employed by Catalina, Inc. as a receiving clerk. I have a 10th grade education and can read and write. I left California last Saturday, April 3, 1954. My brother, Leon, left with me. I had quite a bit of trouble with my car on the way through. My intention of coming back here was trouble with my wife. I thought maybe it would be best to get away for a while and maybe I could straighten things out between us. I came back here planning on getting work. I had been laid off my job about two weeks previous to that time. I put all my miscellaneous stuff I didn't want to carry with me in Lester's house trailer. I took a gun from Lester's trailer house. Leon and I got in the car and left from there and started back. The car was not in good shape so we didn't travel fast. We had trouble with it so at various times we did work on it. Finally it was completely about shot. It would run but that is about all you could say for it."

Immediately thereupon, the two Knudsens proceeded to interrogate petitioner concerning the details of the trip from California, the movements and actions of the Grandsingers after reaching the Nebraska-South Dakota vicinity, the events at the scene and time of the homicide, the petitioner's movements after the encounter with the sheriff and Hansen and his eventual apprehension. Both of the Knudsens participated in the questioning, one inquiring at a time, though with no prearrangement as to sequence. And Mrs. Wells stenographically record-

13. She appeared upon the trial in this proceeding as a witness for respondent, under the name of Frances Bloom.

ed that interrogation. The interview and its recording extended over an interval somewhere between two and three hours in length, ending at about 6:30 p. m. on April 9, 1954. Immediately thereupon, and while petitioner waited in an adjoining room, Mrs. Wells in the County Attorney's office transcribed the notes of the interview into typewritten characters. For that purpose she required and utilized an additional three hours. The transcription extended through sixteen and one-half pages of typewritten material. As its production progressed, the County Attorney, who had returned but had not been present during the interview, collected the pages successively produced and presented them to petitioner who read and signed each page and on a few of the pages initialed changes in the transcription. His signature on the final page was attested by three men who signed their own names as witnesses but were not present during, and had no other part in, the taking of the statement. They were Robert E. Hamilton, Mayor of Valentine, Richard Davenport, a banker, and Ben F. Wilkinson, Clerk of the District Court of Cherry County. At the commencement of his interrogation that afternoon, petitioner was still wet, unkempt and unclean. At its inception he was handcuffed and his handcuffs were affixed to a restraining belt, a situation imposed upon him promptly on his capture and thereafter kept in effect, supra. Upon disputed testimony, the court finds from the clear weight of the testimony that at, or shortly after the opening of, and throughout, the actual interrogation and the reading and signing of the statement, he was released from the handcuffs. He admitted the making of such release before the signing but testified that it did not occur until after the completion of the interrogation. The court, however, considers the evidence to the contrary to predominate and be much more persuasive. Leo Knudsen was armed during the interrogation. Jack Knudsen was not. Neither during nor before the interview did either of the Knudsens or Mrs. Wells or the County Attorney exert any physical force or violence upon, or directly or indirectly offer any threats, or make any promises or inducements, to petitioner.[14] At the commencement of, and throughout, the interview, petitioner was in a state of exhaustion, the precise degree of which may not, from the evidence, be declared with certainty. But these demonstrated circumstances tend to reflect it. He had not eaten anything since about midafternoon of the previous day. Nor, after his capture was he provided with any food until about 9:30 o'clock at night after the interview and his reading and signature of the statement. And since the morning of April 7, 1954, if the state's position be granted that he and his brother had participated in the Wewela burglary, his only sleep had been such as he had gotten while he was briefly resting from time to time in his car and for a short while on April 8, 1954 at Brandenberg's home, or as he had furtively taken during the night of April 8–9, 1954 while he was hiding in the neighborhood where he was later captured. He was, besides, in such state of perplexity as would naturally be prompted by the awareness of his position after the encounter on the highway in the night of April 8, 1954 and by his pursuit and capture by the law enforcement authorities and the posse.

Concerning the real significance of the statement emerging from the interview discussed in the most recent paragraph there appears to be a difference of opinion on the part of counsel. It is variously asserted to be a confession and denied to have that consequence. In the form in which it is before this court and was introduced in the trial of petitioner for murder in the District Court of Cherry County, Nebraska, a large segment of it, including a brief portion of its fourteenth page, all of its pages fifteen and sixteen, and the first part of its page seventeen, has been covered beyond the

14. Upon this subject a single general finding touching the sheriff and members of the state patrol is made later therein.

possibility of determining its content. What that excluded material was the court may not know and offers no suggestion. But the rest of it, which, upon the trial for murder was received in evidence, is really just a factual and historical statement, almost completely in recorded questions and answers, not directly or unequivocally confessing the killing by petitioner of Hansen or even petitioner's firing of his pistol, whether intentionally or otherwise, during his encounter with Hansen. Still, it does not categorically deny the firing of the pistol. On the contrary it allows, and seems to advance, a supposition that in an effort to get rapidly away from the scene of the encounter petitioner's pistol was discharged while he had it, but perhaps without his intention, and that in consequence of that discharge Hansen was killed, although petitioner professes in the statement not to know that that supposition reflects the real occurrence. The instrument is, therefore, a statement rather than a "confession" strictly so-called. Nevertheless, a jury examining and considering it might well regard it as inculpatory in character. And in the context of petitioner's trial in the state court, it was an item of material evidence calculated to be greatly to his disadvantage.

After the signing of the statement just discussed, petitioner was provided by the sheriff with a meal which that officer had purchased for him. After he had eaten that meal, and at about 10:00 p. m., on April 9, 1954, and still in the District Court area in the court house, the questioning of petitioner was resumed, this time by the sheriff, Lieutenant Leo Knudsen, and a Captain Smith of the highway patrol. That interrogation extended until a time somewhere between 2:00 a. m. and 5:00 a. m., and, as the court believes from the evidence, about 3:00 a. m. on Saturday, April 10, 1954. He was then taken to the jail for sleep during the remainder of the night. Exactly what additional information, if any, was obtained in that interview does not appear from the record before the court.

On Saturday, April 10, 1954 after waking and eating breakfast petitioner was questioned further for a short but not exactly identified time, by the sheriff, Captain Smith and another member of the highway patrol. During some of that time there was also present a news reporter who asked a question or two. In that session also, finger prints and photographs were taken of petitioner. Again, the exact substance of the interrogation is not made clearly to appear.

Also on April 10, 1954 and from about 10:00 a. m. until 3:00 or 3:30 p. m., petitioner was taken by the sheriff and others to the place where the homicide had occurred where he remained during most of the interval, and later returned to the jail. In the course of that trip and at the scene of the shooting he cooperated with the officers, including the sheriff, by directing the placing of automobiles and persons in places to simulate the positions of the vehicles and men involved in the event of the night of April 8, 1954. And in association with and as a part of that "recreation of the situation", photographs were taken and a question and answer statement, with the County Attorney as the inquirer and petitioner as the addressee and answerer, was stenographically taken by one Ted McElhaney, the official court reporter of a neighboring state court district. During the murder trial that statement, which was transcribed but not signed, and the photographs or some of them were received in evidence. And because of their disclosure of petitioner's presence at the site and time of the homicide and his location and movements, those items have to be regarded as material evidence to his disadvantage.

After the return of petitioner to the jail that afternoon and his evening meal, he was again questioned in the District Court area of the court house from an early evening hour not exactly defined until late at night. The result is not clearly disclosed.

Again on Sunday, April 11, 1954 petitioner was taken to the District Court

area and interrogated by the same three men from some time after a breakfast at about 8:30 a. m., until shortly before noon. Whereupon, he was returned to his cell in the jail.

At about 5:00 or 6:00 p. m. of the same day, by prearrangement with the County Attorney of Cherry County, George H. Reis, a post-office inspector, with headquarters at Pierre, South Dakota, James F. Shoemaker, Sheriff of Tripp County, South Dakota, and Frank B. Cole, merchant and postmaster of Wewela, South Dakota and the victim of the Wewela burglary of April 7 or 8, 1954, appeared, and petitioner was taken to the District Court area to be interviewed by them, and especially by Reis, in relation to the Wewela burglary. Petitioner was acquainted with, and friendly to, Shoemaker. In the presence of Shoemaker and Cole, Reis interrogated petitioner and prepared a statement in narrative form reflective of the substance of the interview. The statement was prepared sentence by sentence in the language of Reis, who, however, as he proceeded, sought and obtained the approval by petitioner of each of its items. The period of between two and one-half and three hours was required for the interview and the preparation of the statement which was in three single spaced typewritten pages. When it was completed, petitioner read it, initialed some three minor alterations in it, and signed each of its pages and swore to it in the presence of Reis in his official capacity, and of Shoemaker and Cole, each of whom signed the statement as a witness. During the murder trial the statement was received in evidence upon the state's offer. In almost its entirety it relates wholly to the Wewela burglary and that was the motive for its procurement. Even that part of it, however, has relevance and materiality to the murder case in that it reflects the burglary at Wewela on the night before Hansen's fatal pursuit of petitioner and Leon Grandsinger and suggests a persuasive motive for the effort of the latter two to elude or escape from apprehension. Petitioner seems not to charge that any inducement or promise or force or coercion, physical or moral, was directly employed or exerted upon him to obtain that statement. No persuasive evidence of such action moves this court to find that it occurred. But he is understood to make two contentions against its use upon his trial. The first is that, although no force or coercion or inducement or promise was immediately employed to get the statement, it has to be regarded as forced and involuntary because of the entire history of his treatment after he was taken into custody. The second is that Reis intruded into the statement two items which are not reflective of anything which petitioner had told him. These are, a) the following sentence early in the statement:

"Previously I have made a statement to officers . concerning my shooting of officer Marvin Hanson." (sic),

and b) these sentences from the next to the last paragraph:

"We were stopped on the road east of Valentine about 20 miles and were stopped by Sheriff Bill Freeman and Highway Patrolman Marvin Hanson, (sic). I previously have made a statement to officers concerning my shooting and killing Patrolman Marvin Hanson." (sic)

Since the quoted language of the statement contains a manifest implication of the petitioner's actual shooting and killing of Hansen, it was calculated to be materially and relevantly damaging to him as evidence in his trial. But, from considerations discussed at some length later herein, the court is convinced as a matter of fact that petitioner has not proved either that the written statement of April 11, 1954 was made as a result of any promise, inducement, force or coercion or that the quoted language was introduced into it by Reis without being declared by petitioner himself.

On Monday, April 12, 1954, a warrant of arrest was served for the first time on petitioner. On that day also he was removed from the jail and taken before the County Judge and formally arraigned on

the murder charge and pleaded not guilty to it. He was then returned to the jail. As an item subsidiary to his main contentions in this proceeding, petitioner asserts that he did not know when he was taken to county court for what purpose he was being taken, and that he did not understand the arraignment or his plea and merely followed the directions of the County Attorney in pleading not guilty. But, on the whole evidence, the court finds that that assertion is not true either in its entirety or in any of its parts.

Until his arraignment and for about two days thereafter petitioner was not allowed by the sheriff to see or interview any member or members of his family. His father had called at the sheriff's office on April 9, 1954 and asked to see him but was refused access to him and told to return for that purpose on Wednesday, which was April 14, 1954. A woman cousin of petitioner asked to see him on April 10, 1954 and again on April 12, 1954; and each time her request was refused. She called and saw him without objection on April 14, 1954. On that day also he was seen by his father and another friendly person and also by Mr. William C. Heelan of Valentine, an attorney at law then recently employed for him by his father, vide infra. The earlier refusals of access to petitioner, whether by the sheriff or by another in charge of the jail, were responsive to the sheriff's resolution to postpone contact with him from the outside pending the completion of such interrogation of him as might be desired. Even after his arraignment petitioner was further interrogated from time to time, but it does not appear that in that interval any statement from him was taken which is drawn directly into question in this proceeding.

Petitioner strongly insists that, from the moment of his delivery to the sheriff until—and even after—his arraignment, he was subjected to repeated manifestations of violence and force, both physical and mental, in some measure by members of the Nebraska state highway patrol, but largely by the sheriff himself. And he has offered evidence, chiefly, in the way of his personal testimony, but to some extent through the testimony of others, which, if true, supports that position. But generally and in most of its particulars, that testimony is disputed. Putting aside for the moment the primary claim in that connection of the involuntary and coerced character of the statements, written or oral, attributed to him and received in evidence in the course of his murder trial, and dealing directly only with the subsidiary charge of the use towards him of force and coercion, or either of them, the court is convinced that petitioner has failed to prove by the preponderance of the evidence the exertion on him of such coercion or force.

The attempted proof of any such conduct by members of the highway patrol is simply unconvincing. Generally, in its greater part it is rather too indefinite and vague to be considered adequate foundation to support the overturning of a jury's verdict found and returned after a long trial and sharp conflict. One item of that character deserves special and direct attention. One John Riley Skinner who in April, 1954 was a member of the highway patrol, was called as a witness in the supplemental hearing herein, principally because of his volunteering, after the earlier part of the hearing, to present further support of the charge of physical and mental mistreatment of petitioner by the sheriff on the way to Valentine in the afternoon of April 9, 1954. When he testified he did offer such additional support. But he also went farther and testified that on the trip to Valentine he himself had both physically mistreated petitioner, e. g., by pulling his hair twice, and had also talked to petitioner abusively and menacingly. The court does not regard Skinner as a credible witness. His bearing and manner in giving evidence were not favorable to his acceptance as worthy of belief. And he had a rather obvious motive to discredit the patrol and the sheriff. On April 9, 1954 he was only a recently en-

rolled member of the patrol in which he had first been employed in September, 1953. By June, 1955 he had resigned from his position in the patrol upon request of one of his superior officers who was one of the men responsibly in charge of the search for petitioner on April 9, 1954, by reason of exceptions that had been taken both to the accuracy of Skinner's daily reports and to his use of a patrol automobile. His attitude towards the patrol was something less than cordial.

And, upon conflicting evidence touching the question, the court is satisfied that the petitioner has not convincingly established any mistreatment of him by the sheriff. This is true despite one incident. While stopped briefly on the school house grounds before leaving for Valentine, the sheriff at the request of news photographers placed his hand rather roughly on petitioner's head and turned it around. The court was and is frankly unimpressed by that officer in his appearance as a witness in the trial of this proceeding. But his asserted oppression of petitioner during the investigatory phase of the latter's prosecution is a matter of concrete fact; and the court finds that it has not been proved. Consideration has been given to the evidence both ways upon this point, that offered by petitioner himself, that of Skinner, that of a witness Sheppard and other testimony and facts tending to support petitioner's position on the score of coercive oppression, as well as that of the sheriff and several other witnesses to the contrary. What has been said of Skinner's testimony relating to the acts of any patrol members, including himself, is largely but not equally true of his statements touching the sheriff's acts and speech. Sheppard's evidence, in the court's estimation, based upon observation of him as a witness, is also unconvincing. Despite his profession of a reluctance to recall an incident discreditable to a peace officer he had really no such reluctance and testified willingly, almost eagerly. In this connection the court has attributed no practical signifi-

cance to the effort of respondent to show that, notwithstanding his denial, Sheppard had been convicted of a felony. The judicial record upon the point is highly ambiguous, enough so that the witness' denial of the conviction may be regarded as merely his understanding of the legal effect of the record; and an understanding which is not necessarily unsound. And even if he be wrong in his understanding, the asserted conviction does not imperatively discredit him as a witness. In fact, the court sees no reason in the present context to accord that consequence to it. The court merely regards Sheppard as an unconvincing witness, quite apart from the collateral matter of his alleged earlier conviction on a felony charge. On the whole record, it is found that the contention of the use of threats or force or violence, physical or mental, upon petitioner has not been established. But the court recognizes that that point alone is not decisive upon the broader question of the freedom and voluntariness and admissibility in evidence of the several statements of petitioner, whether written or oral.

One difficulty which the court has encountered at this point in its ruling is the virtually complete absence of oral evidence upon it from a strictly disinterested, as well as credible, source. From the standpoint of respondent, the factor of interest affects the testimony of the members of the State patrol and the sheriff and such other persons as participated in the apprehension and interrogation of petitioner. For petitioner neither Skinner nor Sheppard is regarded as a really disinterested witness. And, as a witness, petitioner is himself subject to the most compelling quality of interest. His very life is in the balance and may well be considered to depend upon his evidence. The weighing of testimony emerging from such sources is admittedly a difficult task, its conclusion something less than infallibly sure.

After careful examination of the record before it, the court finds that the petitioner has failed to prove by a preponderance of the evidence, as a mat-

ter of primary and independent fact, his allegations that his statements were, or that any of them was, involuntary, coerced or the product of threat, force, violence or undue pressure exerted upon him by anyone. That the burden of proof upon that issue rests upon him he recognizes; and he has undertaken to carry it. The law so requires. Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L. Ed. 61; Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Walker v. Johnston, 312 U.S. 275, 61 S.Ct. 574, 85 L.Ed. 830; Williams v. Kaiser, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398; Brown v. Allen, supra.

While the entire record of petitioner's trial in the state court is not presently before this court as evidence, much of it is; and that includes the trial judge's charge to the jury. And this court has precautionarily read and examined the 1,243 page transcript of testimony in that trial which, though only partially introduced and subject to consideration as evidence in this proceeding, is physically in the court's possession. From what is strictly before this court, it appears that in the state court trial petitioner made timely challenge to the various statements attributed to him on the score of their coerced, extorted and involuntary character. The trial judge allowed evidence to be introduced and received responsive to those challenges, and, in his charge, submitted the issue thus made to the jury for its determination. Three pertinent instructions included in his charge are copied in a footnote hereto.[15] Upon due considera-

15. Instructions numbered 20, 21 and 22 of the trial judge's charge follow:

"Instruction No. 20

"The jury is instructed that evidence has been introduced tending to show that the defendant made certain verbal admissions or statements appearing in evidence. Verbal statements or admissions should be received by you with great caution, as they are subject to much imperfection and mistake, owing to the person speaking not having clearly expressed his own meaning, or the person spoken to not having clearly understood the speaker. It frequently happens, also, that the witness, by unintentionally altering a few words or expressions really used, gives an effect to the statement entirely at variance with what the speaker did say. In this connection the jury should bear in mind the infirmity of memory and that the mind of the prisoner himself is often oppressed by the calamity of the situation, and that he is sometimes influenced by motive of hope or fear to make statements."

"Instruction No. 21

"The State has offered in evidence alleged statements and admissions claimed to have been made by the defendant. The defendant contends not only that these statements were not voluntarily made but also that they do not correctly reflect what he said or meant. Before you can consider any such alleged statements or admissions as evidence, you must be satisfied and believe from the evidence:

"1. That such statements or admissions were made by the defendant;

"2. That at the time same were made the defendant was mentally capable of making the same; that he understood what he was doing, and the effect thereof, and;

"3. That same were made freely and voluntarily and not by reason of any hope or fear on his part or by reason of any promises, threats, inducements, coercions, or compulsions of anyone.

"In determining these questions you should consider all the evidence given in the trial of this case, examining and analizing (sic) it carefully, taking into consideration the position of the defendant at the time such alleged statements or admissions are claimed to have been made by him, the circumstances surrounding him, the credibility of the witnesses detailing the circumstances, defendant's strength or weakness of mind and body, his mental and physical condition as shown by the evidence, the probability or improbability of the alleged statements or admissions, and whether the same, if made by the defendant were made by reason of any hope or fear on his part or induced by any promises, threats, inducements, coercions or compulsions.

"If you are satisfied by the evidence that any such statement or admission was made by the defendant, and that the defendant knew at the time what he was doing, and was mentally capable of making the same at the time, and that same was freely and voluntarily made by him, and not induced by any promises, threats, inducements, coercions or compulsions on the part of anyone, then you should consider any such statement or admis-

tion, this court believes that the cited portion of the charge fully and fairly and correctly submitted the issue to the jury, whose prerogative it was to pass upon it. The ensuing verdict of guilty is consistent with, though it does not necessarily establish, the jury's acceptance of the view that the several statements, or some of them, were free, voluntary and uncoerced. Brown v. Allen, supra. This court, however, considers the fact of the orderly and correct submission of that issue to the jury not as presently binding upon this court, but only after the fashion contended for in Brown v. Allen, supra. And, though factually rejecting, supra, petitioner's charge of threat or personal force or coercion, physical or mental, practiced upon petitioner, the court has considered the facts clearly demonstrated to have occurred as reflective adversely upon the freedom and voluntariness of petitioner's statements, and each of them. These include the facts and circumstances leading up to his capture on April 9, 1954, his then mental state and bedraggled physical appearance and condition; the delay until late in the night of his apprehension in providing petitioner with food; the duration of the interval between his apprehension and his preliminary hearing; his detention during that time in confinement and in the sole custody of the state and its officers; the de-

nial then of access to him by members of his family; the fact that through that time he had no legal counsel; his repeated interrogation generally for considerable periods of time and by different investigators; and in generality the entire history of his custody and treatment. But, in the absence of the establishment of actual and practicable threat, force or coercion as a factor supporting or inducing or generating the statements, or any of them, the court is persuaded that the history of petitioner's treatment just summarily recalled should not be allowed, in and of itself to require the rejection of the statements or to overturn the conviction and sentence resting in part upon their reception.

The foregoing conclusion is valid especially when one regards the circumstances in which the three most significant statements were made. These were the written question and answer statement of April 9, 1954, the stenographically recorded interview at the scene of the homicide on April 10, 1954, and the narrative statement to post office inspector Reis on Sunday, April 11, 1954.

The argument against the validity of the statement of April 9, 1954 proceeds upon the supposition that was gotten only after some six hours or more of relatively continuous questioning, at the end of which petitioner yielded and confessed.

sion so made and give the same such credence and weight as you deem it entitled to receive, and if the jury believes all or the whole of any statement or admission to be true, they should act upon the whole as true. But the jury may believe part of any such statement or admission and reject the balance, if they see sufficient grounds in the evidence for so doing.

"On the other hand, even if you believe any statement or admission to be true you should wholly disregard and not consider any statement or admission in evidence, if you are not satisfied from the evidence that the same was made by the defendant, that it correctly reflects what the defendant said or meant, and that at the time of making the same he knew what he was doing and the effect thereof, that he was mentally capable of doing so, and that same was made voluntarily and freely by the defendant, and not in-

duced by any hope or fear on his part or by reason of any promise, threat, coercion or compulsion of anybody."

"Instruction No. 22

"You are instructed that the law does not bar all inducements which may be made in an effort to secure a statement or admission from one suspected of a crime. Such statement or admission is not rendered involuntary merely because it is elicited by inquiries and questions addressed to the accused by officers or the mere fact that it was made after a prolonged examination of the accused or the mere fact that the accused was in the custody of the officers at the time it was made. It is for the jury to determine from all these facts, if they be shown, and all the surrounding circumstances in evidence whether any statement or admission so offered was in fact voluntary."

But that notion is completely unrealistic and fallacious. Petitioner was taken to the court house and into the District Court precincts with due punctuality upon his apprehension. Once there, and without badgering or undue pressure, and with only brief preliminary inquiry, the interrogation proceeded. And it has to be remembered that that interrogation *constituted* the statement. *It was not something that preceded a confession.* The interrogation itself required about three hours for its completion. What followed was merely the transcription of the notes reflecting the interview; and that took an additional two and one-half or three hours. The time was required and consumed in the actual making of the statement, rather than in efforts upon petitioner to induce its making.

Much the same is to be said of the narrative statement taken by Reis on the evening of April 11, 1954. He and petitioner proceeded, at once on their coming together, to the making and recording of the statement. On that occasion their conversation was not directly recorded but was, rather, substantially reflected in historical fashion; and that consumed the not at all unreasonable time of two or three hours.

And the demonstration and photographing and the interview, recorded by a court reporter but not submitted to or signed by petitioner, which occurred at the scene of the shooting during the afternoon of April 10, 1954 was not something which produced results only after protracted grilling. It took some time for its own accomplishment, indeed; but it does not represent a period of pressure, moral or physical, followed by a confession.

The court is not unaware that, through all of those days petitioner labored under the difficulties that inevitably resulted from his activities on April 7 and 8, 1954 and that portion of April 9, 1954 preceding his apprehension, and under the emotional strain that was associated with his capture and custody under a not ungrounded suspicion that he was guilty of the murder of a peace officer. Those circumstances, doubtless, served measurably to depress him and to predispose him to anxiety. But they were quite properly not allowed to immunize him from orderly investigation by the State's authorities charged with the administration of its laws and the maintenance of its good order. Persons suspected of, and taken into custody for, the commission of crime, even if the crime be deliberate murder, have constitutional rights which must be respected and jealously safeguarded. But the judicial conservation of those rights must not become maudlin. Officers charged with the detection and prosecution of persons so suspected and apprehended are not required to become queasy in the performance of their duties. The efficiency of civilized criminal investigation must not be nullified by an overemphasis upon the immunities of suspected criminals which results ultimately in the destruction of the security of society's observers of its laws. One in custody in the belief that he is guilty of a major felony must expect to submit to fair and reasonable and humane, even if persistent and searching, inquiry. Thus only—or at least principally—may the facts be found. And, if he be guiltless, his interrogation should serve to point the way to reality and hasten his release.

In finding against petitioner upon the issue of the alleged involuntariness of his statements and their constitutional inadmissibility as evidence against him in the trial for murder, the court is dealing only with that issue as a direct and primary ground for his discharge from custody under the writ heretofore issued in this proceeding. That finding does not reach the significance of that issue as an asserted phase of the vital charge that, for reasons and by means already explained, petitioner in his trial was deprived of the constitutionally guaranteed right of the effective assistance of counsel. The court proceeds, finally, to its determination of that question. And, first, the facts relating to it will be found and announced.

Petitioner was not represented in his state court trial by court appointed counsel. So far as the record discloses, no such appointment was made or sought. While petitioner was not represented by, and did not confer with, counsel until April 14, 1956, two days after his arraignment and plea of not guilty, he did on that date confer with Mr. William C. Heelan who had theretofore—though exactly when does not appear—been employed for him by his father. Mr. Heelan was a member of the bar of Nebraska in good standing and of long experience who was in practice at Valentine. He had been admitted to the bar in 1911. (see Vol. 89 Neb. p. V). Then, as of a date which is not clearly shown, petitioner's father also employed in petitioner's behalf, Mr. Charles A. Fisher, a practicing attorney in good standing, of Chadron, Nebraska who had been a member of Nebraska's bar since 1927. (see Vol. 115 Neb. p. V). As the much younger and, therefore the more vigorous of the two attorneys, as well perhaps as because of his wider experience in jury trial work, Mr. Fisher served as petitioner's principal attorney. Mr. Heelan's position was substantially that of an assistant to or associate of Mr. Fisher in the trial and in the work preparatory thereto. At this point it may be observed that, although both of petitioner's attorneys participated actively in his trial in the state court and later joined in signing the motion for new trial and petition in error, Mr. Heelan died on a date that is not shown, but was quite early after the trial and substantially before the submission of the appeal to the state's Supreme Court. For practical purposes, petitioner's only attorney in his basic appeal, and except as has already been indicated, was Mr. Fisher.

The information, filed on May 7, 1954 in the District Court of Cherry County, Nebraska after preliminary hearing in the County Court, contained two counts, the second of which charged petitioner with the killing of Marvin Hansen in the course of the commission of another felony. On June 1, 1954, Messrs. Fisher and Heelan in behalf of petitioner filed a motion to quash that second count as being beyond the court's jurisdiction; and, after hearing on the following day, the motion was sustained and the assailed count was dismissed. On the latter date also, the arraignment of petitioner was had in the District Court of Cherry County and he entered a plea of not guilty to the remaining count which charged him with premeditated murder in the first degree.

Petitioner's trial was opened on Friday, June 5, 1954, and proceeded on June 5, 7, 8, 9, 10, 11, 12, 14 and 15, 1954. It was completed and submitted to the jury at 5:00 o'clock p. m., on June 15, 1954.

In the course of the trial it became highly material to establish the cause of Hansen's death, and, if it were a bullet wound, to show the calibre of the bullet. As has already been stated, the only .22 calibre firearm identifiable as being in the neighborhood at the time of the killing was the pistol which had been traced into petitioner's possession, but could not be located after the tragedy. The evidence showed that Leon Grandsinger's .22 calibre pistol was not fired that night and that only .38 calibre pistols were in the possession of the sheriff and Hansen. By medical testimony the state had introduced evidence that Hansen's death was caused by a .22 calibre bullet. And by other evidence it had also undertaken to show that a hole in a pants belt[16] being worn by Hansen when he was shot, which was located at a point immediately outside the point in Hansen's body where the fatal bullet entered, was also made by a .22 calibre bullet. The pants belt had been identified as an exhibit during the trial and shown to the jury. And it was being kept among the exhibits in the case.

16. Not to be confused with a "Sam Browne" belt also worn at the time by Hansen and also bearing holes of the same general character.

During the morning of April 15, 1954, after the evidence in the trial had been concluded and when the next step in the trial was to be the oral arguments of counsel, which would be followed immediately by the court's charge to the jury and the consequent submission of the case, the exhibits, including the pants belt, were on a table in the court room. The jury was not yet recalled to, and was not in, the court room. In that situation, Mr. Fisher approached the table bearing the exhibits, picked up the pants belt and a wooden dowel, and pushed the dowel through the hole in the pants belt with force sufficient to enlarge materially the size of the hole in the pants belt. Without his expectation, Mr. William Quigley, the County Attorney, came into the room and saw him in that act. At that time in the judge's chambers adjacent to the court room, the trial judge, Mr. Rush C. Clarke, Special Prosecutor, who had largely tried the case for the state, and Mr. Heelan of defense counsel, were already present in anticipation of the initiation of the closing arguments of the trial. After Mr. Quigley had overtaken Mr. Fisher in the latter's tampering with the belt Mr. Quigley and Mr. Fisher came into the judge's chambers, and Mr. Quigley orally disclosed to the judge in the presence of Messrs. Clarke, Heelan and Fisher, what he had just observed in the court room in the way of Mr. Fisher's conduct. Mr. Fisher did not deny, but admitted, the accusation. Thereupon, a conference between the judge and the four attorneys ensued which consumed somewhere between forty minutes and one hour. At or very shortly after its close the judge went upon the bench, the jury was recalled into the court room, counsel appeared, and in the presence and hearing of the jury, the following proceedings were had and taken, of which the official court reporter made a complete record:

"By Mr. Clarke:

"Before we proceed with the arguments, Your Honor, there is a matter that has been taken up with, Your Honor, which we wish to get into the record.

"The Court: Very well.

"Mr. Clarke: We wish the record to show that counsel for the defendant, is willing that it shall show, that this morning in this court room, after the court reporter had brought all the exhibits in the case out and laid them on the reporter's desk, Mr. Fisher, one of the counsel for the defendant, while he was examining Exhibit No. 10, being the leather pants belt heretofore identified as the belt of Marvin Hansen, and that at that time he took a dowel, being one of the wooden dowels on the reporter's desk, and being either the same or one exactly like the one I am holding in my hand, which I will have to have marked as an exhibit, and pushed it violently—

"Mr. Fisher: (Interrupting) I didn't violently push it—

"Mr. Clarke: (Interrupting) pushed it through the hole in the belt hard enough so that it materially enlarged the size of the hole to an extent which cannot now be determined and that the belt, Exhibit No. 10, is not now in the same condition as it was when it was offered in evidence and received in evidence, and that the hole is now materially larger than it was before Mr. Fisher did that.

"(Mark this dowel as an exhibit, please.)

(The wooden dowel refered (sic) to was marked as Exhibit No. 75.)

"The Court: Mr. Fisher, as I understand it you have told counsel that you did that?

"Mr. Fisher: Yes.

"The Court: You recognize that the hole is larger?

"Mr. Fisher: Yes.

"The Court: The court admonishes all counsel and everyone else and the jury when they go to deliberate

upon this matter to not probe these exhibits. They can make comparisons but they cannot probe these belts with any dowel, or change the condition of any exhibits. Very well, you may proceed."

Petitioner had not seen Mr. Fisher's conduct and knew nothing of it. Nor had he participated in the conference in the judge's chambers between counsel and the judge. So far as appears in this record, he had no part in, and gave no approval of, the proceedings had in open court before the jury in the way of the making of the record just quoted. While he heard its making there is no showing that he had any anticipation of, or as to its import or significance to him understood, it. He had, however, overheard Mr. Fisher, on emerging from the judge's chambers, remark that he might be subjected to discipline; but for what, petitioner did not know.

The record before this court does not show the course of the full discussion which had occurred in the judge's chambers beyond what has already been found, supra. But from the material thus dictated into the murder trial record before the jury, the conclusion is inescapable that in that conference, Mr. Fisher had agreed to allow, and participate in, the making of the record thus dictated; that Mr. Clarke had insisted upon, and agreed to lead in, its making; and that the trial judge was aware of what was to be done, and whether willingly or reluctantly, doubtless the latter, participated in it. It is impossible to conclude or find what part Mr. Heelan had in the arrangement for the making of the record before the jury. But he made no protest when it was made. There is nothing in the record before this court which leads this court to suppose that Mr. Heelan had any part in Mr. Fisher's tampering with the belt or knew in advance that it was to occur.

Immediately following that incident, the closing arguments of counsel were made in which Mr. Fisher participated in petitioner's behalf; and the court charged the jury and submitted the case to it.

The court has already announced a finding as to the hour at which the verdict of the jury was returned and the character of the verdict. It has also made a finding of the almost immediate preparation and filing by Mr. Fisher of a motion for new trial, and the submission and denial of that motion and the imposition of the sentence of death upon petitioner.

Reference is now made, without repetition, to the earlier findings herein of the failure of either the motion for new trial or the petition in error to raise at all any issue upon the disclosure before the trial jury of Mr. Fisher's conduct touching the pants belt, and also to the generalized presentation in those two pleadings of the issue of error in the reception of evidence and the lack of vigor and directness and precision with which, on the initial appeal, that issue was briefed in the state's Supreme Court. It is now noted and found that upon the subject of the reception in evidence of the statements, oral and written, of petitioner, that court in those parts of its opinion in review of the conviction and sentence which are directly pertinent, said:

" * * * There are exhibits in the record showing the position of the three cars after they stopped. As a matter of fact, photographs received in evidence show the location of the cars and the position of the sheriff, patrolman, and defendant as they alighted therefrom. Such locations and positions were fixed by defendant himself on April 10, 1954, when he voluntarily made a statement to officers at the scene of the tragedy."

*　　*　　*　　*　　*

"During the afternoon of April 9, 1954, defendant voluntarily made and read a written confession which, by interlineation, was corrected in certain particulars by defendant in his own handwriting and signed by him on each page thereof in the

presence of three witnesses who signed as such. Again, on April 10, 1954, defendant voluntarily gave another transcribed similar statement at the scene of the crime during which he placed the cars, himself, the sheriff, and the patrolman in the positions where they were located at the time of the shooting, and demonstrated what happened there. Again, on the afternoon of April 11, 1954, defendant voluntarily made and read another written confession which also, by interlineation, was corrected in certain particulars by defendant in his own handwriting, and was signed by him on each page thereof in the presence of two witnesses who signed as such. Further, such confession, was subscribed and sworn to before a post-office inspector who as such acknowledged same.

*"Defendant in his testimony claimed that the confessions aforsaid were not voluntarily given, and equivocally denied that he had made several statements contained therein. However, those were matters for determination by the jury under appropriate instructions given by the trial court."* (Emphasis added.)

\*     \*     \*     \*     \*

"Defendant argued that the trial court erred in admitting part of a conversation which defendant had with a sheriff from South Dakota who was a friend of defendant and present when defendant made a confession on April 11, 1954. The conversation is too long to set forth here. It is sufficient for us to say that the trial court admitted it solely for the limited purpose of helping the jury decide whether or not such confession was voluntary, and the jury was so cautioned by the court. Defendant, in his objections to the conversation said that, 'even though it might tend to' so assist the jury, such conversation was inadmissible because it related in part to another crime previously committed by defendant. In that regard, defendant

testified at length about such conversation, and, even assuming that a part thereof offered by the State was erroneously admitted, it could not have been prejudicial to defendant's rights. We find no prejudicial error in admission of the evidence under the circumstances."

It is obvious from the foregoing quotation that the consideration which the Supreme Court of Nebraska gave to the challenge to the reception in evidence of "a conversation which defendant had with a sheriff from South Dakota" (relating clearly to a part of the setting for the statement given to Post-office inspector Reis) was oriented to the admissibility of that conversation as foundational material despite its inclusion of an admission by petitioner of his earlier apprehension on account of other transgressions of an unidentified nature. It does not disclose a consideration of and ruling upon the basic question of the admissibility of the statements of petitioner concerning the offense for which he was on trial. Upon that subject, it would appear from a careful reading of the opinion that the consideration and ruling of the court are reflected and expressed only in the two sentences most recently underlined herein. And while it may well be that the language just adverted to should be regarded broadly as adequate to declare a judicial finding that, in point of fact, the issue of the freedom and voluntariness of those statements, had been submitted properly to the jury under legally correct instructions, the conclusion is inescapable that no such declaration is explicitly made by it. True, the matters were "for determination by the jury under appropriate instructions given by the trial court." But had the reviewing court examined the record and the instructions and found the instructions to be appropriate and the evidence adequate, within those instructions, to support a jury's finding that the statements and each of them were free and voluntary? The court does not appear to have felt called upon so to assert. And it may very well be that

one reason for its disinclination to proceed that far was the tenuous character of the issue as it was presented to that court upon the appeal.

Reference has already been made, and will not be repeated, to petitioner's discharge of Mr. Fisher as his counsel and the date of such discharge. The further appellate proceedings in the State's Supreme Court, the unsuccessful quest of review through certiorari and this proceeding have followed that discharge.

Against the factual background in its entirety, which has already been set forth, the court is confronted with the question whether, upon the record petitioner has made out a case adequately supporting his charge that, by the conduct of Mr. Fisher, in relation to that of Mr. Clarke in behalf of the State of Nebraska and of the trial court, he was deprived in his trial of his constitutionally guaranteed right to the effective assistance of counsel. In full awareness that he carries the burden of proof upon that issue, vide supra, the court concludes that the question has to be answered affirmatively. In reaching that answer, consideration has to be given first to his plight throughout his trial and to what actually occurred and its meaning.

As petitioner approached his trial his life was at stake. He was charged with the crime of murder in the first degree in the disturbing circumstance that the victim of the asserted homicide was a state officer engaged in the performance of his duty of preserving the public peace. His problem was complicated further by his own then recent engagement in various unlawful acts whose probable unfolding in the course of his trial would almost inevitably impinge adversely upon his defense.

His father, in his behalf and with his approval, employed as his attorneys Messrs. Heelan and Fisher, both of whom were recognized and experienced attorneys at law. So far as anything before this court discloses, no antecedent relations had existed between those attorneys, or either of them, on the one hand, and petitioner and his father, or either

of them, on the other. And the employment appears to have been made upon the faith of the attorneys' recognized acceptance as members of the legal profession. Petitioner entered upon his trial, relying upon the ability and integrity of his attorneys, and, until the incident immediately preceding the oral argument, nothing had occurred to impair that reliance.

The evidence received in the course of the long trial had served to intensify, rather than to minimize, the danger of petitioner's position. Besides other damaging material against him, several of his own statements involving inculpating admissions on his part had been received. With the issues thus none too hopefully drawn, the critical occasion for the final submission of the case was immediately before the participants in it.

In that situation, Mr. Fisher upon his own initiative and responsibility and without petitioner's participation or awareness, meddled with the pants belt in the way which has already been discussed, and thereby altered a vital item of evidence in such wise that thereafter it appeared, and would continue to appear, materially different from its appearance when it had first been introduced and received during the trial. Detected by the County Attorney in his misdoing, he was taken into the trial judge's chambers for what was undoubtedly a mortifying interview between the judge and all counsel in the case, at which petitioner was not present.

Then, the jury was recalled, the court reconvened, and the record was made which, twice already set out at length, need not be repeated. And in that setting the closing arguments were made and the judge's charge to the jury was imparted. The verdict was returned promptly on the following morning and was followed in rapid succession and on the same day by the preparation, filing, submission and denial of the motion for a new trial and the pronouncement of the judgment of guilt and sentence of death.

And the steps just recounted were succeeded in due order by the appellate proceedings already noted.

Mr. Fisher's manipulation of the pants belt and the wooden dowel may hardly be characterized too sternly. It was a furtive, dishonest, unprofessional act, inevitably designed to distort a critical bit of evidence, to the supposed advantage of his client and to the confusion of the prosecution. It was, by its very nature, intended to induce the jury or some of its members to believe that that item was a thing materially different from what it had been when it was brought into court and presented and received in evidence. As Mr. Fisher must certainly have been aware, the acknowledgment or proof of guilt of such conduct by a member of the bar in the course of a contested trial of a proceeding in court would subject such a miscreant to punishment for contempt of court or to professional discipline, even including permanent disbarment from the practice of law, to say nothing of other possible sanctions. It was with a consciousness of those harsh possibilities that he found himself overtaken in his transgression by one of the attorneys engaged in the trial against him of the case, and was, thereupon, taken unwillingly into the inquisition before the judge and his own professional associate and adversaries.

From that ordeal in chambers, Mr. Fisher emerged manifestly beaten and crushed. What immediately ensued leaves no doubt on that score. For the state's special prosecutor, eager for the kill and with his wounded victim all too plainly acquiescent, at once set the stage and in the presence of the jury that was so shortly to pass on the petitioner's guilt and right to continue to live, recounted, and made Mr. Fisher to admit, the latter's shameful act. And Mr. Fisher readily acknowledged it with only a minor haggling over a single word, and that, in the circumstances, not really important. Nor can it be forgotten that this occurred in the presence and with the ostensible approval, however reluc-

tantly given, of the trial judge, a matter of no little significance to the jury.

While it has been argued on the present submission that only petitioner's own counsel, not provided by the state but employed by his father in his behalf, transgressed, and the State of Nebraska was without fault, there is no virtue in that position. It can hardly have been advanced sincerely. For, once Mr. Fisher had been overtaken in his misconduct, Mr. Clarke, who appeared and prosecuted specially for the State of Nebraska and, therefore, acted in its behalf, became the aggressor and, with studied and much too evident purpose, turned Mr. Fisher's wrong into an incident dramatically publicized in the jury's presence, to Mr. Fisher's humiliation and disgrace and petitioner's immense peril. It does not lie now with the State of Nebraska smugly and falsely to exclaim "Shake not thy gory locks at me, nor say I did it". Moreover, the position of the state is not wholly clear, insofar as it is rooted in the action of the trial judge. He presided over the trial, including the dragging of the errant Mr. Fisher before the jury. And he may not be wholly absolved from responsibility for the record that was then made. It is true that he was confronted with a hard choice for whose precipitation he was not at all responsible. But, whether from the standpoint of the special prosecutor or from that of the trial judge, the loss of two weeks of valuable trial time, even the hazard of the erection of a double jeopardy defense or any other allowable alternative, might well have been preferred to that which actually was done to the already hard pressed petitioner.

In that instant and by that display, what had theretofore been an orderly trial was perverted into a virtual legal lynching. From that time forward, Mr. Fisher stood discredited before the jury in respect of petitioner's case. The argument he was shortly to make was stripped of its persuasiveness and effectively damned in the jury's estimation; for his acknowledged trickery would rise at every turn to plague him and to nullify

**236**

his contentions. More directly to the point, petitioner's case itself was discredited. For implicit in the brief but startling exposure before the jury of Mr. Fisher's wrongdoing was an admission that the defense was so devoid of merit as to need gross deception and falsification of the evidence for its support. And it was in that sordid atmosphere that the closing arguments were made, the instructions were given and the case was submitted to the jury for its deliberation.

It could not, of course be demonstrated with finality that the verdict was necessarily controlled by that incident. But by the teaching of the authorities upon the point, vide infra, it need not be so demonstrated. .

■ The constitutional right of a defendant charged with the commission of a felony, especially of a capital offense, to be effectively represented in his trial by counsel has been vindicated by many authoritative judicial opinions, of which only a few need now be cited. This right unquestionably exists in prosecutions conducted in the United States Courts. Johnson v. Zerbst, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L. Ed. 680; United States v. Hayman, 342 U.S. 205, 72 S.Ct. 263, 96 L.Ed. 232; Craig v. United States, 6 Cir., 217 F.2d 355. It is no less valid and imperatively to be protected as a minimal requirement of due process of law under the fourteenth amendment of the Constitution of the United States in prosecutions in the courts, and for the violation of the criminal laws, of the several states. Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158; Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, 90 L.Ed. 61. Many other cases might, but need not, be cited to substantially like effect.

Emphasis is properly placed in the opinions upon the requirement that the assistance of counsel be effective. It is not enough that a defendant be ostensibly represented by an attorney in his trial. It is necessary that no situation be created or allowed to exist which serves to nullify, or materially to impair, the reality of the representation which appears to have existed. Thus, the practical denial to counsel, provided and otherwise competent, of adequate time to prepare for trial is sufficient to destroy the effectiveness of counsel, Hawk v. Olson, 326 U.S. 271, 66 S.Ct. 116, as is also a practical uncertainty respecting the procurement and status of counsel. Powell v. State of Alabama, supra. And especially destructive of the real worth of counsel is the existence of any situation which may well be considered to destroy or impair the undivided loyalty and dedication of counsel to his client's cause. Glasser v. United States, supra; United States v. Hayman, supra. And it has to be remembered that on his being overtaken by Mr. Quigley in his gross professional misconduct, Mr. Fisher was consciously exposed to the destruction of his career as an attorney, as well as to possible criminal sanctions. Vigor thereafter in the pressure of his client's cause might easily have resulted to his disadvantage, even though it was by no means certain or highly probable that his cooperation with the prosecution would be effective to avert from him the wrath which he deserved. But he patently chose the way of cooperation.

Glasser v. United States, supra, although admittedly distinguishable from the present proceeding in some phases of their respective settings, is, nevertheless, highly instructive to federal trial courts faced with this court's present task. Glasser was a skilled and experienced lawyer. For several years he had been a trial lawyer as an assistant United States Attorney in a metropolitan district. Along with another attorney similarly situated named Kretske, and a lawyer engaged in private practice, and certain other men, he was indicted in his own district for conspiracy to defraud the United States of its right faithfully to be represented in its courts. The heart of the charge was the erection of a scheme whereby, for bribes, the government attorneys concerned would be

remiss in the performance of their official duty to prosecute persons suspected of violating the federal liquor laws. Besides being a lawyer himself, Glasser had employed and was represented by two other attorneys, one Callaghan and one Stewart. As the time for trial approached, Kretske's privately employed counsel asked leave to withdraw. The trial judge then inquired whether Stewart might not be appointed as Kretske's attorney. To that inquiry Stewart responded suggesting a doubt arising out of a possible conflict of interest between Glasser and Kretske, and Glasser, inter alia, said: "I would like to enter my objection. I would like to have my own lawyer representing me". [315 U.S. 60, 62 S.Ct. 464.] The judge, thereupon, deferred the making of an appointment of counsel and required Kretske's attorney, who desired to withdraw, temporarily to remain in his service. Then, after a short colloquy and during the same session of the court and with Glasser still present, the judge did appoint Stewart to represent Kretske. Of that appointment the writer of the opinion notes simply, "Glasser remained silent. Stewart thereafter represented Glasser and Kretske throughout the trial and was the most active of the array of defense counsel." It may sufficiently be observed that during the trial incidents arose in which it might clearly have been for Glasser's welfare, but to the disadvantage of Kretske, to have Stewart in behalf of Glasser proceed in a certain way. He elected not to do it. Glasser was convicted and sentenced and the Court of Appeals affirmed his sentence. But the Supreme Court reversed the conviction and remanded the case for a new trial. In its opinion the court said in part:

"The guarantees of the Bill of Rights are the protecting bulwarks against the reach of arbitrary power. Among those guarantees is the right granted by the Sixth Amendment to an accused in a criminal proceeding in a federal court 'to have the Assistance of Counsel for his defense'. 'This is one of the safeguards * * * deemed necessary to insure fundamental human rights of life and liberty' and a federal court cannot constitutionally deprive an accused whose life or liberty is at stake of the assistance of counsel. Johnson v. Zerbst, 304 U.S. 458, 462, 463, 58 S.Ct. 1019, 1022. Even as we have held that the right to the assistance of counsel is so fundamental that the denial by a state court of a reasonable time to allow the selection of counsel of one's own choosing, and the failure of that court to make an effective appointment of counsel, may so offend our concept of the basic requirements of a fair hearing as to amount to a denial of due process of law contrary to the Fourteenth Amendment, Powell v. [State of] Alabama, 287 U.S. 45, 53 S.Ct. 55, so are we clear that the 'Assistance of Counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired.

"To preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights. Aetna Insurance Co. v. Kennedy, 301 U.S. 389, 57 S.Ct. 809, 81 L.Ed. 1177; Ohio Bell Telephone Co. v. Public Utilities Commission, 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093. Glasser never affirmatively waived the objection which he initially advanced when the trial court suggested the appointment of Stewart. We are told that since Glasser was an experienced attorney, he tacitly acquiesced in Stewart's appointment because he failed to renew vigorously his objection at the instant the appointment was made. The fact that Glasser is an attorney is, of

course, immaterial to a consideration of his right to the protection of the Sixth Amendment. His professional experience may be a factor in determining whether he actually waived his right to the assistance of counsel. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023. But it is by no means conclusive.

"Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused. Speaking of the obligation of the trial court to preserve the right to jury trial for an accused Mr. Justice Sutherland said that such duty 'is not to be discharged as a matter of rote, but with sound and advised discretion, with an eye to avoid unreasonable or undue departures from that mode of trial or from any of the essential elements thereof, and with a caution increasing in degree as the offenses dealt with increase in gravity.' Patton v. United States, 281 U.S. 276, 312, 313, 50 S.Ct. 253, 263, 74 L.Ed. 854. The trial court should protect the right of an accused to have the assistance of counsel. 'This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.' Johnson v. Zerbst, 304 U.S. 458, 465, 58 S.Ct. 1019, 1023.

"No such concern on the part of the trial court for the basic rights of Glasser is disclosed by the record before us. The possibility of the inconsistent interests of Glasser and Kretske was brought home to the court, but instead of jealously guarding Glasser's rights, the court may fairly be said to be responsible for creating a situation which resulted in the impairment of those rights. For the manner in which the parties accepted the appointment indicates that they thought they were acceding to the wishes of the court. Kretske said the appointment could be accepted 'if your Honor wishes to appoint him (Stewart)', and Stewart immediately replied: 'As long as the Court knows the situation. I think there is something in the fact that the jury knows we can't control that.' The court made no effort to reascertain Glasser's attitude or wishes. Under these circumstances to hold that Glasser freely, albeit tacitly, acquiesced in the appointment of Stewart is to do violence to reality and to condone a dangerous laxity on the part of the trial court in the discharge of its duty to preserve the fundamental rights of an accused.

\* \* \* \* \*

"There is yet another consideration. Glasser wished the benefit of the undivided assistance of counsel of his own choice. We think that such a desire on the part of an accused should be respected. Irrespective of any conflict of interest the additional burden of representing another party may conceivably impair counsel's effectiveness.

"To determine the precise degree of prejudice sustained by Glasser as a result of the court's appointment of Stewart as counsel for Kretske is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial. Cf. Snyder v. [Commonwealth of] Massachusetts, 291 U.S. 97, 116, 54 S.Ct. 330, 336, 78 L.Ed. 674; Tumey v. [State of] Ohio, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749; Patton v. United States, 281 U.S. 276, 292, 50 S.Ct. 253, 256. And see McCandless v. United States, 298 U.S. 342, 347, 56 S.Ct. 764, 766, 80 L.Ed.

1205. Of equal importance with the duty of the court to see that an accused has the assistance of counsel is its duty to refrain from embarrassing counsel in the defense of an accused by insisting, or indeed, even suggesting that counsel undertake to concurrently represent interests which might diverge from those of his first client, when the possibility of that divergence is brought home to the court * * * ."

While procedural steps had a material part in the conclusion reached in United States v. Hayman, supra, the court there also recognized the necessity of undivided and unimpaired loyalty of counsel to his client's interest during a trial. In that case the defendant's attorney, without defendant's awareness, was also employed as counsel for one of the material witnesses against the defendant.

Recognizing the essentiality to due process of law, in the absence of an actual and understanding waiver, of the availability to petitioner throughout his trial for murder, of the effective assistance of counsel, and the teaching of the reported opinions upon the ingredients of such effective assistance, this court is convinced and concludes that, by the incident of June 15, 1954 already repetitively reported and discussed, petitioner was deprived of the effective assistance of counsel, in violation of his constitutional right thereto. True, he then had two attorneys. But Mr. Fisher was his chief counsel who had led in his defense. Before the jury he, principally, represented petitioner. Mr. Heelan merely assisted Mr. Fisher. When in the sobering moments immediately preceding the closing arguments he publicly submitted to his officially reported degradation, supra, he also dramatically betrayed petitioner. He did that both by destroying his own effectiveness as an advocate, and by supporting the direct inference that petitioner's cause, so recently supported by Mr. Fisher's base conduct, needed such tactics for its maintenance, and was, therefore, unworthy and invalid. It was a staggering blow from which recovery was impossible and did not occur.

It is now frankly acknowledged that the ruling presently made is premised entirely upon that trial occurrence. All other elements urged upon the court in petitioner's support are appraised as collateral to it and rather in the nature of "make weight" considerations. These include, a) Mr. Fisher's participation, after his exposure and on the day of the return of the verdict, in the arrangement for the hurried preparation, filing, and submission of, and ruling upon, the motion for a new trial and the imposition on petitioner of the death sentence; b) his preparation of the petition in error with its omission and infirmity already noted; and c) his failure in the State's Supreme Court both to raise at all any question of his own disservice to his client's cause and adequately and vigorously and directly to present the problem of the freedom and voluntariness of petitioner's several statements touching the offense with which he was charged. Conceivably, any of those other features might have occurred without the background of Mr. Fisher's detected tampering with the pants belt. Any one of them might, under some circumstances, be attributable to professional inattention or incompetence against which, though with certain reservations, society is not obliged to guard a client. All of them in combination do, however, serve to illuminate the court room incident and the debasement which it reflects. They have, therefore, been accorded appropriate consideration, although it is now clearly asserted that they are not the basis of the court's judgment, and that, if they stood alone and were not associated with Mr. Fisher's acknowledgment in open court of his illicit act, they would not have moved the court to the action it now announces.

■■ The denial to petitioner in his trial of the effective assistance of counsel requires the conclusion which the court now announces, that the "judgment and sentence" in pursuance of which re-

spondent holds petitioner in custody is void. Yet, the record before the court clearly discloses that, upon the assumption of the complete invalidity of that judgment and sentence, petitioner is left subject to custody under the information filed by The State of Nebraska in the District Court of Cherry County charging him with the commission of murder in the first degree and to eventual and timely trial under that information. He should not, therefore, be now finally and unconditionally released from custody. On the contrary, the court, in the performance of its statutory duty to "dispose of the matter as law and justice require" Title 28 U.S.C. § 2243, should a) intercept and permanently enjoin the execution by the respondent of the death sentence heretofore pronounced upon and against defendant, and b) discharge him from the custody of the respondent insofar as such custody is in pursuance of such judgment and sentence, but c) expressly preserve, and make such discharge dependent on and subject to, the right of The State of Nebraska by its appropriate officer or officers, to take the respondent into, and retain him in, its lawful custody under the information now pending against him in the District Court of Cherry County, Nebraska and to proceed to his eventual and timely trial upon the charge against him made in such information. And that will be the order and judgment of this court herein.

This memorandum shall constitute the findings of fact and conclusions of law in the proceeding. But counsel for petitioner will forthwith prepare and submit to counsel for respondent for examination and approval or suggested amendment or revision, an order and judgment in accordance with the announcement herein made; and upon approval will submit the same to the court for signature and entry; or, upon suggested amendment or revision, will submit the same, together with such suggested amendment or revision, to the court for settlement and signature and entry. The order and judgment shall be so prepared as to speak and be effective, not as of this date, but rather as of the date of its signature and entry.